STATE of Wisconsin, Plaintiff-Respondent,

v.

Derryle S. McDOWELL, Defendant-Appellant-Petitioner.

Supreme Court

*No. 02–1203–CR. Oral argument February 11, 2004.—Decided June 11, 2004.*

2004 WI 70

(Also reported in 681 N.W.2d 500.)

490

491

494

ROGGENSACK, J., concurs.
SYKES, J., took no part.

For the defendant-appellant-petitioner there were briefs by *Christopher J. Cherella* and the *Law Offices of Christopher J. Cherella,* Milwaukee, and oral argument by *Christopher J. Cherella.*

For the plaintiff-respondent the cause was argued by *Gregory M. Weber,* assistant attorney general, with whom on the brief was *Peggy A. Lautenshlager,* attorney general.

An amicus curiae brief was filed by *John A. Pray, Keith A. Findley,* Madison, on behalf of the Wisconsin Association of Criminal Defense Lawyers and Frank J. Remington Center, Univ. of Wisconsin Law School, and oral argument by *Keith A. Findley.*

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Derryle S. McDowell, seeks review of a published decision of the court of appeals affirming a judgment of conviction and order denying postconviction relief.[1] McDowell was convicted of robbery, kidnapping, and five counts of sexual assault while using a dangerous weapon, all as party to a crime. He contends that he was afforded ineffective assistance of trial counsel that was both deficient and prejudicial. Additionally, McDowell asserts that the circuit court erred in failing to permit him new counsel.

¶ 2. This case discusses the important issue of how criminal defense attorneys should deal with the prospect of client perjury. Specifically, it addresses under what circumstances counsel has knowledge of the perjury sufficient to trigger a requirement that a client testify in the unaided narrative rather than the usual

---

[1] *State v. McDowell,* 2003 WI App 168, 266 Wis. 2d 599, 669 N.W.2d 204 (affirming a decision of the circuit court for Milwaukee County. Judge Dennis P. Moroney presided over the jury trial and entered the judgment of conviction. Judge Victor Manian presided over the postconviction motion and entered the order denying postconviction relief).

question and answer format.[2] Prior to the decision of the court of appeals in this case, no Wisconsin case had defined what standard should be employed to determine when attorneys "know" their clients will lie.

¶ 3. We agree with the court of appeals that defense counsel may not substitute narrative questioning for the traditional question and answer format unless counsel knows that the client intends to testify falsely. Absent the most extraordinary circumstances, such knowledge must be based on the client's expressed admission of intent to testify untruthfully. We further determine that attorneys must advise the client, opposing counsel, and the circuit court of the change of questioning style prior to use of the narrative.

¶ 4. In the case before us, we conclude that defense counsel's performance was deficient in two respects: (1) he shifted to narrative questioning without advising his client beforehand; and (2) he used narrative questioning despite believing that his client intended to testify truthfully. We also conclude, however, that McDowell suffered no prejudice under the facts of this case. Finally, we reject McDowell's claim that the

---

[2] Commentators have described the narrative format as follows:

> The narrative approach allows the lawyer to put the client on the stand and allow him to tell his story in a free narrative manner. While this occurs, the lawyer does not engage in the testimony; she asks no questions of the client and presents no corroborating evidence. The client is allowed to present his testimony to the court without help from the attorney. In his closing argument, the attorney does not and cannot rely on any of the client's false testimony.

Brian Slipakoff & Roshini Thayaparan, *The Criminal Defense Attorney Facing Prospective Client Perjury*, 15 Geo. J. Legal Ethics 935, 951 (2002) (internal citations omitted).

circuit court erred in failing to permit him new counsel. Accordingly, we affirm the court of appeals.

## I

¶ 5. On April 21, 1997, an 18–year-old woman was sexually assaulted near a building at 4720 West Burleigh Street, Milwaukee. She had exited a bus and was followed by two men with guns. The men rushed her and forced her off the street. With guns to her head, they robbed her, fondled her, and repeatedly assaulted her sexually, penetrating her orally and vaginally by both penis and gun barrel. After the assaults, the victim spat ejaculate.

¶ 6. Although the victim could not identify her attackers, the State built its case based on evidence collected from her body, her clothing, and the scene. Police recovered a sample of the victim's saliva mixed with semen containing McDowell's DNA. They also recovered evidence containing the DNA of the second man, who eventually pled guilty.

¶ 7. McDowell was appointed counsel from the State Public Defender's Office. On the first day of trial, counsel informed the court that McDowell had fired him over the weekend. The exchange between the two was as follows:

> [DEFENSE COUNSEL]: Judge, just so the Court is aware, I was fired over the weekend and that is where we stand.
>
> THE COURT: He has no right to fire you. Only I can.
>
> [DEFENSE COUNSEL]: I understand that. I am just advising the Court that Mr. McDowell has discontinued any efforts to assist, and that is where we are.

THE COURT: Mr. McDowell, you have to understand something. [Defense counsel] is an officer of this Court. This matter has been scheduled for trial. This Court is the only one that has that authority to fire him, not you. If you decide you are not going to cooperate, well that is your own situation, but you don't have any rights to fire him. Only I do. And I am telling you on the weekend before trial he is not going to be fired by this Court.

This Court knows [defense counsel], knows his abilities, and he is staying on the case. [The] [c]ase is going to trial today. Understand it. You have a right to finality. So do the people of the State of Wisconsin. So do the victims in this case or alleged victims, and that is what is going to happen.

¶ 8. Later that day while discussing pre-trial motions, defense counsel informed the court that he did not know what the theory of defense would be because McDowell had become unassistive. Wary of another delay, the court indicated an intent to move forward with the case.[3] It stated:

Well he must be unassistive long before this past weekend, so let's not get into that. That is hogwash. Let's go. The issue is long before this weekend with the amount of appearances we have had in this court on this case. If we don't have a theory of defense formulated and then whatever little iron[-]outs you have to do, that is different. That is an ongoing process anyway all during trial.

---

[3] The record indicates that the case was initially scheduled for jury trial July 26, 1999. Subsequently, it was rescheduled for September 20, 1999. It was rescheduled again for November 15, 1999, and then again January 24, 2000. It was rescheduled yet another time for March 6, 2000. Finally, it was rescheduled for May 15, 2000, when the trial proceeded.

¶ 9. The court then told McDowell that he could decide whether to cooperate with counsel. It explained, "Either you help or you don't help, and that is your decision. Obviously if you don't help[,] it obviously hurts your situation more than it helps it, but that is your call, not mine. Fair enough?" McDowell replied "Yes." Defense counsel later informed the court that he would reserve his opening statement until the close of the State's case.

¶ 10. On the third day of trial, after the State had rested, defense counsel expressed reservations to the court about his ability to effectively proceed as counsel. Although not specific, he implied that his concerns related to the possibility that McDowell would testify untruthfully. The court advised counsel that he had two options: (1) he could recommend to McDowell that he not testify if his intended account was untrue or so outrageous that a trier of fact would hold it against him; or (2) take the "middle ground" by calling McDowell to testify in narrative form.

¶ 11. While the court acknowledged a third option in counsel's motion to withdraw, it rejected that request because the resulting mistrial would affect "not only the rights of [McDowell] but the rights of all the other people" involved in the nearly completed jury trial. The court further reasoned that allowing counsel to withdraw would not necessarily accomplish anything since McDowell's next attorney would likely face the same ethical dilemma.

¶ 12. After a short break in which defense counsel conferred with McDowell, he informed the court that his client would be testifying truthfully. He declared:

> Your honor, I have spoken with Mr. McDowell. Mr. McDowell advised me he does wish to testify and that what he would be testifying to will be the absolute truth

with respect to anything regarding this testimony. He wishes to get up there and testify as to the truth. . . .

Judge I have no reason to believe in light of what Mr. McDowell has told me that he will not get up there and testify as to the truth. Therefore when he takes the stand I will be asking him questions, specific questions with respect to his testimony before this jury.

¶ 13. The court accepted counsel's decision. However, it warned him that "should something change," he should immediately advise the court and then proceed in the narrative form of questioning.

¶ 14. Defense counsel subsequently gave his opening statement. He told the jury that McDowell would testify that he never assaulted the victim and that the area where the crime took place was behind the building where his father lived. Counsel further explained that McDowell had been in the area the night before the assault, had oral sex with his girlfriend, Sunshine, and had ejaculated, which would account for the semen being found at the scene.

¶ 15. After completing his opening statement, defense counsel called McDowell to the witness stand. Shortly after McDowell took the stand, counsel received a note from the public defender's office. Defense counsel began his examination in the conventional question and answer format and asked three questions about McDowell's age and residence. He then stated, "Mr. McDowell, I want you to look at this jury and tell this jury about the events of April 20 and April 21 of 1997. Take your time and speak loudly and clearly please." As McDowell began his answer, defense counsel interrupted and asked the court if it wanted a sidebar conference, and the court responded, "I certainly do."

¶ 16. Following an off-the-record discussion, the court instructed the jury that it was not to consider the

opening statements or closing arguments of counsel as evidence. It then directed defense counsel to restate the question. He said, "[a]gain, Mr. McDowell, take your time and tell this jury what you would like for them to know regarding the allegations against you beginning with where you were and what you were doing on April 20, 1997, through the early morning hours of April 21, 1997. Proceed please." The defendant responded with the following narrative answer:

> On April 20, 1997, I was by my father's house at 4720 West Burleigh. Later on in the afternoon I had company. My girlfriend came over sometime in the afternoon. We watched TV. We got movies and ate, joked around, played around. And as the evening went through we continued to watch movies, and I asked my father could I go to the gas station. He told me to take out the garbage before I went to the gas station so me and my girlfriend was cuddled up and I continued to ask did she want to go out in the back with me. And she first continued to tell me no, but afterward she told me yes. So I asked my father can I go to the gas station. He told me to take out the garbage.

> Instead of me taking out the garbage, me and Sunshine, my girlfriend, had just went out the door to go to the gas station. That is where we were at. At the gas station we had two sodas and returned back to my father's apartment, 4720, but then we didn't go inside the apartment. We went outside around the back. While we was in the back we was fooling around and had oral sex in the back, and then by the time we had oral sex, after we were through and everything like that, my father ended up coming out in the back bringing out the garbage and caught me and my girlfriend fooling around back there and got yelling and screaming at me and my girlfriend telling us to go in the house. As we went to the house he told my girlfriend to call her mother, and he continued to yell and fuss and every-

thing at us. Her mother wasn't there, so he told her to get ready to take her home. Afterwards she got ready to go and continued fussing, continued to argue at us, and we took her home. And then we came back. First me and my father rode around because he continued to talk to me about what just happened back there, how dangerous it was and how we could have got in trouble and what we was doing was wrong. So we finally arrived back to my father's house. When we arrived we went in the house and went back to sleep.

That is what happened according to them days.

¶ 17. Defense counsel asked two more questions relating to McDowell's four juvenile adjudications. The prosecutor then conducted a brief cross-examination during which McDowell admitted that he had attempted to avoid arrest and run from the police. McDowell also revealed that he was a friend of the other man who had been convicted of the assaults. There was no re-direct examination.[4]

¶ 18. In his closing statement, defense counsel commented at length on the nature of DNA evidence. He then asked, "Where would you expect to find DNA material of yours? In your house? . . . Where else would you expect to find your DNA material but around where you in fact live or work or someplace that you fre-

---

[4] Following the prosecutor's cross-examination, the circuit court said, "All right. There is no re[-]direct allowed under the circumstances of this Court's ruling." As the court of appeals noted in its decision, the preclusion of re-direct examination would appear to be the logical corollary of the restriction to narrative questioning in most instances. *McDowell*, 266 Wis. 2d 599, ¶ 14, n. 7. However, like the court of appeals, we do not view that preclusion as absolute. Instead, we leave to the circuit court's discretion whether additional questioning would be appropriate under the circumstances of the case.

quent?" Counsel observed, "There is an expectation that you could find evidence of Mr. McDowell being related and associated with 4720 West Burleigh."

¶ 19. After the case was submitted to the jury, defense counsel provided an account of the off-the-record sidebar that had occurred when he shifted from question and answer to narrative form. He indicated that he had planned to proceed in the question and answer format. However, he acknowledged receiving a note from legal counsel at his office, which changed his mind. Counsel did note, however, that he had previously advised McDowell as to what a narrative entailed. He explained:

> Subsequent to the initial decision to go ahead and do a question and answer with regards to Mr. [McDowell's] testimony, I did in fact receive an opinion back from Attorney Bill Tyroller [sic], who is both an appellate attorney as well as legal counsel for the agency, advising me that I should go with narrative. I did in fact advise Mr. Derryle McDowell that that is the way we would be proceeding, and we had already discussed what the narrative entailed prior to, as a result of prior discussions, so he was familiar with what it was that I was advising him that we were going to do in terms of his testimony. So that was the result of me making a switch from question and answer to the narrative.

¶ 20. During deliberations, the parties briefly reconvened to address a question from the jury: "Need to know time frame between sexual act with girlfriend and the time [the victim] was assaulted." The court stated that it intended to instruct the jury to use its collective memory relative to the time frame, if any, between the two acts. Neither the prosecutor nor defense counsel objected.

¶ 21. Ultimately, the jury found McDowell guilty of all counts. He was sentenced to 40 years in prison, consecutive, on all five counts of first-degree sexual assault, followed by a consecutive probationary sentence on the two remaining counts. McDowell subsequently moved for postconviction relief, arguing, among other things, that his attorney had provided ineffective assistance of counsel and that the circuit court had erred in failing to permit him new counsel.

¶ 22. At the *Machner*[5] hearing, defense counsel testified that he initially believed that McDowell and his girlfriend, Sunshine, had not engaged in any sexual activity behind the building the night before the assaults based on his pretrial discussion with them. He noted inconsistencies between their accounts.[6] Moreover, he explained that McDowell had introduced the oral-sex-the-night-before theory of defense only after learning that any scientific challenge to the DNA evidence would be useless. Counsel ultimately decided not to call Sunshine as a witness.

¶ 23. In addition, defense counsel testified that McDowell had asked, "[']What if Sunshine and I get together and we say . . . ,[']" and had told him, "[']I'll say what I need [to] say to help myself out and if I have to say something untruthful I'll say that. I need to help myself out.[']". Counsel said that he warned McDowell

---

[5] Under *State v. Machner,* 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979), a hearing may be held when a criminal defendant's trial counsel is challenged for allegedly providing ineffective assistance. At the hearing, trial counsel testifies as to his or her reasoning on challenged action or inaction.

[6] At the *Machner* hearing, defense counsel testified that Sunshine's statements regarding the location of their alleged oral sex conflicted with the physical evidence, specifically the location of the semen recovered from the crime scene.

that he might have to testify in the narrative. In that situation, he advised McDowell to testify to everything he wanted the jury to hear because it would be his only opportunity.

¶ 24. Finally, defense counsel elaborated on the events leading to McDowell's actual testimony. He explained that he had intended to proceed in the question and answer format, as McDowell had eventually informed him that he was going to tell the truth. However, counsel acknowledged that his plan later changed when he received a note from the public defender's office, urging him to shift to the narrative. The note said, "Tyroler says go with a narrative. Tell that to the client. It must be narrative." Accordingly, defense counsel converted to the narrative form. He conceded, however, that he did so without either advising McDowell of the change beforehand or having concluded that McDowell intended to lie.

¶ 25. McDowell, meanwhile, testified at the hearing that he never told defense counsel he was going to testify untruthfully. He maintained that he was of the impression that counsel was going to employ the traditional question and answer format, not the narrative. Furthermore, McDowell stated that he had never testified before a jury before and was nervous and confused. He insisted that had he been asked, he would have testified that the night before the assaults Sunshine performed oral sex on him, that he was not wearing a condom, that he ejaculated at the scene, and that he never committed the crimes.

¶ 26. The circuit court denied McDowell's post-conviction motion. It noted that McDowell had placed defense counsel in an untenable position, and that counsel had reacted in a way that best preserved both his client's rights and his own ethical responsibilities.

The court further surmised that even with McDowell's full and complete testimony, the outcome of the trial would have been no different in light of the indisputable scientific evidence. Finally, it upheld the decision to proceed with existing counsel. The court explained, "with the jury literally in the wings, and the case ready to proceed, with the witnesses present and everybody having said they were ready to proceed, that that's a discretionary call by Judge Moroney, and he made that decision." McDowell appealed.

¶ 27. The court of appeals affirmed the circuit court. *State v. McDowell,* 2003 WI App 168, 266 Wis. 2d 599, 669 N.W.2d 204. In a thoughtful and scholarly opinion, it set forth the standard that it believed should govern a criminal defense attorney's legal obligations in assessing and responding to possible perjury. *Id.,* ¶ 3. The court stated that "absent the most extraordinary circumstances, criminal defense counsel, as a matter of law, cannot know that a client is going to testify falsely absent the client's admission of the intent to do so." *Id.,* ¶ 47.

¶ 28. Applying that standard to the case at hand, the court of appeals determined that defense counsel was deficient in his performance at trial. *Id.,* ¶ 4. It also concluded, however, that the deficient performance was not prejudicial under the circumstances of the case. *Id.* Finally, the court rejected McDowell's claim that the circuit court erred in denying his request for new counsel. *Id.,* ¶ 24. It reasoned that because the circuit court had received no request for new counsel, it could not have erred in failing to make such inquiry or determination. *Id.,* ¶ 30.[7]

---

[7] The court of appeals additionally rejected McDowell's assertions that (1) the circuit court presented erroneous jury

## II

¶ 29. This case presents an opportunity to address how criminal defense attorneys should deal with the prospect of client perjury. The issue is raised in the context of the first argument in this case: ineffective assistance of counsel.

¶ 30. A claim of ineffective assistance of counsel invokes the analysis set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). To find success, a defendant must demonstrate both (1) that counsel's representation was deficient; and (2) that this deficiency was prejudicial. *Id.* at 687.

¶ 31. Appellate review of an ineffective assistance of counsel claim is a mixed question of fact and law. *State v. Erickson,* 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999) (citing *State ex rel. Flores v. State,* 183 Wis. 2d 587, 609, 516 N.W.2d 362 (1994); *State v. Pitsch,* 124 Wis. 2d 628, 633–34, 369 N.W.2d 711 (1985)). We will not disturb the circuit court's findings of fact unless they are clearly erroneous. *Id.* at 768. The ultimate determination of whether the attorney's performance falls below the constitutional minimum, however, is a question of law subject to independent appellate review. *Id.* (citing *Pitsch,* 124 Wis. 2d at 634).

instructions on the sexual assault counts, thus requiring dismissal of one of them and retrial of the other four; and (2) the circuit court sentenced him based on inaccurate information. *McDowell,* 266 Wis. 2d 599, ¶ 4, n. 2. Because McDowell did not pursue these issues on review, however, we do not address them here.

¶ 32. Additionally, we consider whether the circuit court erred in failing to permit McDowell new counsel. A circuit court exercises discretion in determining whether to appoint new counsel in a criminal case. *State v. Lomax,* 146 Wis. 2d 356, 359, 432 N.W.2d 89 (1988). Accordingly, we review the decision of the circuit court to determine if it erroneously exercised its discretion.

## III

¶ 33. We begin our discussion with the threshold inquiry for evaluating McDowell's claim of ineffective assistance of counsel: Under what circumstances do criminal defense attorneys have knowledge of prospective perjury sufficient to trigger a requirement that a client testify in the unaided narrative rather than the usual question and answer format? Such a question implicates not only the constitutional rights of the criminal defendant, but also the ethical responsibilities of counsel.

¶ 34. The United States Supreme Court has not expressly set forth a standard of knowledge that, when met, requires a criminal defense attorney to reveal client confidences and affirmatively act to prevent client perjury. In *Nix v. Whiteside,* it observed that "[w]hatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying falsely." 475 U.S. 157, 173 (1986). The Court further recognized that, "[a]lthough counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law." *Id.* at 166. However, *Nix*

provided no guidance in determining *when* attorneys had sufficient basis to conclude that their clients intend to commit perjury.

¶ 35. Similarly, the Wisconsin rules of professional responsibility do not articulate a clear minimum standard of knowledge applicable to this case. Supreme Court Rule 20:3.3 (1999–2000)[8] provides in relevant part:

> Candor toward the tribunal.
>
> (a) A lawyer *shall not* knowingly:
>
> (1) make a false statement of fact or law to a tribunal;
>
> (2) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
>
> . . .
>
> (4) offer evidence that the lawyer *knows to be false*. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.
>
> (b) The duties stated in paragraph (a) apply even if compliance requires disclosure of information otherwise protected by Rule 1.6 [regarding confidentiality of information received from a client].
>
> (c) A lawyer *may* refuse to offer evidence that the lawyer *reasonably believes* is false.

(Emphasis added). Supreme Court Rule 20:3.4 provides in relevant part that "[a] lawyer *shall not* . . . falsify evidence, counsel or assist a witness to testify falsely[.]" (Emphasis added).

---

[8] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

¶ 36. The court of appeals reviewed *Nix*, the Supreme Court Rules, together with various legal authorities[9] to discern the appropriate balance. *McDowell*, 266 Wis. 2d 599, ¶ 44. Under its standard, "absent the most extraordinary circumstances, criminal defense counsel, as a matter of law, cannot know that a client is going to testify falsely absent the client's admission of the intent to do so." *Id.*, ¶ 47. The court explained that with its qualification of "extraordinary circumstances," it did not mean to obscure the bright line it created or invite endless litigation; rather, it simply recognized that in the truly exceptional case counsel might be presented with the same dilemma even absent a direct admission.[10] *Id.*, ¶ 48.

¶ 37. The court of appeals offered several justifications for its bright-line rule. To begin, it observed that adopting a lesser standard "would be a defining step in a sad parade" of situations (e.g., negotiated pleas

---

[9] Commentators and courts in other jurisdictions have set forth a myriad of standards for determining when an attorney "knows" his or her client intends to testify falsely. These include: "good cause to believe" a client intends to testify falsely; "compelling support" for concluding that the client will commit perjury; "knowledge beyond a reasonable doubt," "a firm factual basis," "a good faith determination," and "actual knowledge." *See generally, Commonwealth v. Mitchell*, 781 N.E.2d 1237, 1246–47 (Mass. 2003) (citations omitted).

[10] As an example of a truly exceptional case, the court proffered the modern-day Bonnie and Clyde, that is, a couple conclusively captured on video and apprehended at the scene of the crime who inform counsel of their intent to testify that they were never even at the bank. *McDowell*, 266 Wis. 2d 599, ¶ 48, n. 16.

and *Alford*[11] pleas) that, in its estimation, compromised a criminal defense attorney's duty to the client. *Id.,* ¶ 44. Moreover, the court explained that without such an approach, counsel would lack guidance, as they cannot truly "know" whether the client intends to commit perjury. *Id.,* ¶ 45. Finally, it suggested that the requirement of actual knowledge maximized the ability of criminal defense attorneys to protect their clients' Sixth Amendment rights. *See id.,* ¶ 46.

¶ 38. Both McDowell and the amici[12] support the court of appeals as to the standard it set regarding the issue of "knowledge."[13] McDowell writes that, "[t]he decision appropriately balances defense counsel's duty to provide candor to the Court at all times along with his or her continuing duty to provide effective and competent assistance of counsel to the client." The amici, meanwhile, urge us to adopt the approach "because anything less jeopardizes the defendant's right to have a jury decide the facts, undermines the relation-

---

[11] An *Alford* plea is a guilty plea where the defendant pleads guilty while either maintaining his innocence or not admitting having committed the crime. *See North Carolina v. Alford,* 400 U.S. 25 (1970).

[12] The Wisconsin Association of Criminal Defense Lawyers and the Frank J. Remington Center of the University of Wisconsin Law School filed an amicus brief in this case and participated in oral arguments. We echo the sentiments of the court of appeals in acknowledging that our analysis was greatly benefited by their contributions.

[13] McDowell and the amici differ only in their support for the court of appeals' qualification of "extraordinary circumstances." McDowell asserts that the court should not have added a subjective component to an otherwise objective test. The amici, however, are willing to accept such language, acknowledging the potential need for future flexibility.

ship and role of defense counsel as zealous and loyal advocate, and is practically unworkable."

¶ 39. The State, however, contends that the standard of the court of appeals demands too much. Specifically, it asserts that such an approach "will allow attorneys to dodge the ethical dilemma of prospective client perjury quite effectively by practicing selective ignorance of the only fact that would trigger their duty to prevent prospective perjury." The State submits that a different standard—one that takes into account all relevant facts and circumstances—will both protect the client's constitutional rights and better ensure the integrity of the criminal justice system. It therefore asks that we adopt the "firm factual basis" standard.

¶ 40. The difficulty we have with the State's position is twofold. First, the "firm factual basis" standard is really no standard at all. As noted by the amici in their brief, "[l]eaving it up to individual lawyers to 'take into account all relevant facts and circumstances' and decide whether a 'firm factual basis' exists to believe the client will commit perjury tells lawyers virtually nothing about when they should compromise their role as advocate." Such an approach, in our estimation, breeds needless uncertainty.[14]

---

[14] Indeed, it is unclear from the facts and circumstances of this case whether defense counsel ever formed a "firm factual basis" that McDowell would commit perjury. The State contends that he had; however, the defendant notes that his attorney specifically informed the court that McDowell was going to take the witness stand and testify truthfully. This disagreement about what defense counsel believed or should have believed demonstrates the unworkable nature of the State's proffered approach.

¶ 41. Second, we recognize that any standard we adopt should be a high one given the constitutional considerations involved. We are mindful that, "[e]xcept in the rarest of cases, attorneys who adopt 'the role of the judge or jury to determine the facts,' pose a danger of depriving their clients of the zealous advocacy and loyal advocacy required by the Sixth Amendment." *Nix*, 475 U.S. at 189 (Blackmun, J., concurring). As a result, we are reluctant to strip a defendant of the right to counsel or compromise the attorney-client relationship.

¶ 42. Thus, we are satisfied that the approach taken by the court of appeals was the appropriate one.[15] Despite the multitude of standards, courts "generally have set an extremely high standard for" evaluating prospective perjury. Monroe H. Freedman, *But Only If You "Know,"* in Ethical Problems Facing the Criminal Defense Lawyer 138 (Rodney J. Uphoff, 1995).

¶ 43. Accordingly, we determine that an attorney may not substitute narrative questioning for the traditional question and answer format unless counsel knows that the client intends to testify falsely. Absent the most extraordinary circumstances, such knowledge must be based on the client's expressed admission of intent to testify untruthfully. While we recognize that the defendant's admission need not be phrased in "magic words," it must be unambiguous and directly made to the attorney.

---

[15] Although its opinion is a recent one, the court of appeals' reasoning has already been cited with approval. *See* Orange County Lawyer, Formal Op. 2003–01 (Client Perjury and the Criminal Defense Attorney) (2004).

¶ 44. We agree with the observation of the court of appeals that Supreme Court Rule 20:3.3 must be harmonized with our determination here. Like the court of appeals, we "interpret SCR 20:3.3(c)'s suggestion that counsel 'may refuse to offer evidence that the lawyer reasonably believes is false' to apply to circumstances beyond the borders surrounding the questions involving a criminal defendant's stated intention to testify falsely." *McDowell,* 266 Wis. 2d 599, ¶ 47. Indeed, "[a]ny other interpretation would, in our estimation, produce an irreconcilable conflict between the two rules." *Id.* (citing *State v. Zielke,* 137 Wis. 2d 39, 51, 403 N.W.2d 427 (1987)).

¶ 45. On those occasions when a defendant informs counsel of the intention to testify falsely, the attorney's first duty shall be "to attempt to dissuade the client from the unlawful course of conduct." *Nix,* 475 U.S. at 169. As the court of appeals noted, "we do not dismiss the persuasive power of counsel to do so on ethical, legal, and moral grounds." *McDowell,* 266 Wis. 2d 599, ¶ 53. Moreover, we recognize counsel's ability to be persuasive on pragmatic grounds. "By explaining what may be the evidentiary weakness of the false account, counsel can describe the likely consequences that, obviously, the defendant does not desire." *Id.*

¶ 46. In addition, we emphasize that an attorney should seriously consider moving to withdraw from the case.[16] As noted by *Nix,* withdrawal "deprives the de-

---

[16] The withdrawal method, however, is not without its difficulties. Commentators have noted, "it does not solve the problem; it just passes along the ethical dilemma to another attorney." Slipakoff & Thayaparan, *supra* note 2 at 953.

fendant of neither his right to counsel nor the right to testify truthfully." 475 U.S. at 173–74.

¶ 47. If, however, the motion to withdraw is denied and the defendant insists in committing perjury, we conclude that counsel should proceed with the narrative form, advising the defendant beforehand of what that would entail. While far from perfect, we recognize that the narrative represents the best of several imperfect options.[17] It "best accommodates the competing interests of the defendant's constitutional right to testify and the attorney's ethical obligations." *People v. Johnson,* 62 Cal. App. 4th 608, 630, 72 Cal. Rptr. 2d 805 (1998).[18]

¶ 48. Finally, we agree with the court of appeals that attorneys must also inform opposing counsel and the circuit court of the change of questioning style prior

---

[17] These imperfect options include conducting a separate hearing on the potential perjury, refusing to call the client to the stand, and fully cooperating with the defendant. *See* Slipakoff & Thayaparan, *supra* note 2 at 949–53. *See also People v. Johnson,* 62 Cal. App. 4th 608, 621–26, 72 Cal. Rptr. 2d 805 (1998).

[18] Contary to the assertion of the concurrence at ¶ 95, the Supreme Court did not reject the narrative approach in *Nix v. Whiteside,* 475 U.S. 157, 163, n. 6. Rather, it expressed skepticism in it. Despite that skepticism, the narrative has continued to enjoy widespread use and acceptance in criminal trials. *See, e.g., Shockley v. State,* 565 A.2d 1373 (Del. 1989); *Com. v. Jermyn,* 620 A.2d 1128 (Pa. 1993); *State v. Layton,* 432 S.E.2d 740 (W. Va. 1993); *State v. Waggoner,* 864 P.2d 162 (Idaho Ct. App. 1993); *Reynolds v. State,* 625 N.E.2d 1319 (Ind. Ct. App. 1993); *see also* Norman Lefstein, *Client Perjury in Criminal Cases: Still in Search of an Answer,* 1 Geo. J. Legal Ethics, 521 (1988) (endorsing narrative approach after comparing its merits relative to option of informing court).

to use of the narrative. Courts, in turn, shall be required to examine both counsel and the defendant and make a record of the following: "(1) the basis for counsel's conclusion that the defendant intends to testify falsely; (2) the defendant's understanding of the right to testify, notwithstanding the intent to testify falsely; and (3) the defendant's, and counsel's, understanding of the nature and limitations of the narrative questioning that will result." *McDowell,* 266 Wis. 2d 599, ¶ 57.

## IV

¶ 49. We turn next to McDowell's claim that he was afforded ineffective assistance of trial counsel. As noted above, in order to establish ineffective assistance, a defendant must prove that counsel's performance was both deficient and prejudicial. *Strickland,* 466 U.S. at 687. We consider each of these elements in turn.

¶ 50. To prove deficient performance, a defendant must establish that his or her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Judicial scrutiny of counsel's performance will be highly deferential. *Id.* at 689. Deficient performance, nevertheless, may be demonstrated by acts and omissions "outside the wide range of professionally competent assistance." *Id.* at 690.

¶ 51. Here, McDowell contends that his trial counsel's actions were deficient in that he had no reason that justified a switch from the question and answer format to the narrative format. McDowell notes that defense counsel specifically told the court that his client would testify truthfully. Moreover, McDowell observes

that counsel did not change his mind regarding the presentation of the testimony until he was given the "Tyroler note." That note, McDowell reminds us, instructed counsel to "inform the client," which he did not do.

¶ 52. The State concedes that defense counsel rendered deficient performance at trial. Citing the reasoning of the court of appeals, it writes, "the State will not dispute the court's ultimate conclusion that [defense counsel] rendered deficient performance in requiring McDowell to testify in narrative format under the circumstances described above." The State, however, correctly notes that under *Strickland* it does not have to defend counsel's performance to prevail on appeal.

¶ 53. We agree with the parties that defense counsel's performance was deficient in this case. Although we are sympathetic to counsel's dilemma, we determine that his actions ultimately fell "outside the wide range of professionally competent assistance" in two respects. First, he shifted to narrative questioning without advising his client beforehand. Second, he used narrative questioning despite believing that his client intended to testify truthfully.

¶ 54. Accordingly, we address next whether defense counsel's deficiency prejudiced McDowell. Under *Strickland,* a defendant is not required to show that counsel's deficient conduct was outcome determinative. *See id.* at 693–94. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confi-

518

dence in the outcome." *Id.* at 694. In making this determination, reviewing courts are to consider the totality of the evidence before the trier of fact. *Id.* at 695.

¶ 55. McDowell asserts that prejudice should be presumed under the circumstances of the case. He maintains that for all intents and purposes, he was without counsel at a critical stage of the proceeding when his attorney switched from question and answer to the narrative form. McDowell further submits that prejudice should be presumed because his attorney had a conflict of interest at the point in time he received the "Tyroler note."

¶ 56. Additionally, even if not presumed, McDowell advances that he suffered actual prejudice because he was not afforded the opportunity to fully present his defense to the jury. He contends that he had a plausible explanation for why his DNA was found at the scene, which was reconcilable with the remainder of the evidence. Because the jury never fully heard that explanation, McDowell reasons, his defense was prejudiced.

¶ 57. The State, meanwhile, asks that we affirm the conclusion of the court of appeals that McDowell suffered no prejudice. It argues that McDowell's case fits none of the limited circumstances in which this court presumes prejudices. Furthermore, it describes McDowell's theory of defense as both "implausible" and "improbable."

¶ 58. This court has made clear that it will presume prejudice only in rare instances. *Erickson,* 227 Wis. 2d at 770. In the limited category of cases most relevant to McDowell's claim, we have presumed prejudice when "the actual assistance rendered by a particu-

lar attorney has been deemed so outside the bounds necessary for effective counsel that a court has presumed prejudice." *Id.* at 771.

¶ 59. For example, "courts have presumed prejudice when an attorney fails to present known evidence to the court calling into question the defendant's competency to stand trial." *Id.* (citing *State v. [Oliver Ross] Johnson,* 133 Wis. 2d 207, 223–34, 395 N.W.2d 176 (1986)). Likewise, "where an attorney has labored on behalf of a defendant while harboring a conflict of interest, prejudice is automatic." *Id.* (citing *Cuyler v. Sullivan,* 446 U.S. 335, 349–50 (1980); *State v. Kaye,* 106 Wis. 2d 1, 8–16, 315 N.W.3d 337 (1987)).

¶ 60. In the present case, we cannot conclude that defense counsel's action of switching from question and answer to the narrative form was "so outside the bounds necessary for effective counsel" as to constitute a rare instance when this court must presume prejudice. As the court of appeals correctly observed, "[defense counsel] was not absent and McDowell was not unrepresented during his testimony." *McDowell,* 266 Wis. 2d 599, ¶ 71, n. 23. Counsel further indicated that he had warned McDowell about the possible use of the narrative at trial and had advised him to testify to everything he wanted the jury to hear in that situation because it would be his only opportunity.

¶ 61. We also reject McDowell's claim that defense counsel had a conflict of interest that requires an automatic presumption of prejudice. Here, counsel's conflict stemmed from a perceived ethical dilemma between his duty of loyalty to his client and his ethical obligation to the court. This is not remotely the kind of conflict of interest at issue in *Cuyler* and *Kaye. Cuyler*

involved two attorneys' multiple representation of three defendants charged with murder. 446 U.S. at 337. Similarly, *Kaye* involved one attorney's representation of two defendants in the same arson case. 106 Wis. 2d at 3. To equate the divided loyalties in those cases with the potential divided loyalties here misses the mark. In every case, an attorney's loyalty to the client is tempered by the rules of professional responsibility. That divided loyalty, however, is not the type of conflict of interest that rises to the level of a presumption of prejudice.

¶ 62. Absent a presumption of prejudice, McDowell must make a showing of actual prejudice. Like the court of appeals, we "readily acknowledge that McDowell's testimony could have been enhanced and clarified through counsel's questioning." *McDowell,* 266 Wis. 2d 599, ¶ 66. It is true that McDowell's narrative account did not specify that Sunshine had performed oral sex on him, that he was not wearing a condom, or that he had ejaculated on the ground behind the building the day before the assaults. It is also true that McDowell did not actually deny that he had committed the assaults.

¶ 63. However, upon consideration of the totality of the evidence before the trier of fact, we are satisfied that McDowell suffered no actual prejudice in this case. When called upon to testify in the narrative form, McDowell produced an account of his actions during the period in question. That testimony included the date ("April 20, 1997"), activity ("fooling around and had oral sex in the back"), and location ("4720 West Burleigh") that were critical to his "oral-sex-the-night-before" theory of defense. Such information, bracketed by de-

fense counsel's opening statement and closing argument, provided a sufficient basis for the jury to reason its way to an acquittal if it so chose.[19] Indeed, the question submitted by the jury indicates that McDowell's defense was on the mind of the jurors.

¶ 64. Our conclusion that McDowell suffered no prejudice is further supported by "two even more powerful reasons: his defense was preposterous, and the State's evidence was overwhelming." *Id.*, ¶ 68. The court of appeals cogently explains:

> McDowell's defense depended on his account of oral sex the night before with Sunshine at the very location where the assaults occurred. Not only was that theory far-fetched, but it was not going to be supported by any testimony from Sunshine, who, [defense counsel] concluded, should not testify given the inconsistencies between her and McDowell's accounts of their claimed encounter. But, of course, that's not all. McDowell's defense depended not only on the jury's acceptance of his oral-sex-the-night-before account, but also on the extraordinary coincidence of the victim's semen-filled saliva landing on the exact location of his ejaculate. It was not just that McDowell's DNA was discovered at the scene, but that his semen was mixed with the victim's saliva. As [defense counsel] testified at the *Machner* hearing, not only was McDowell's oral-sex-the-night-before defense a stretch, it was not, standing alone, exculpatory. [Counsel] was blunt: "The bottom line ... was ... that mixed sample put his penis in her mouth."

*Id.*, ¶ 69.

---

[19] As the circuit court correctly noted in its instructions to the jury, opening statements and closing arguments of counsel are not evidence. However, we need not ignore them in evaluating whether, in the full context of the trial, McDowell was able to present his essential defense.

¶ 65. In the end, we determine that defense counsel's deficiency was not so prejudicial that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Indeed, the probability of selecting a person at random with the same DNA profile as McDowell in this case was approximately one in six billion. As a result, we reject McDowell's claim of ineffective assistance of counsel.

## V

¶ 66. The final issue we consider is whether the circuit court erred in failing to permit McDowell new counsel. In situations involving appointment of new counsel, a circuit court's exercise of discretion is triggered by a defendant's presentation of a substantial complaint that could be interpreted as a request for new counsel. *State v. Kazee,* 146 Wis. 2d 366, 371, 432 N.W.2d 93 (1988). When a substantial complaint is made, the trial judge should inquire whether there are proper reasons for substitution. *Id.* (citations omitted).

¶ 67. Here, there is no dispute that on the morning of the first day of trial, defense counsel advised the court that McDowell had "fired" him over the weekend. There is also no dispute, however, that neither counsel nor McDowell explained why. Accordingly, the question becomes whether the circuit court erroneously exercised its discretion by failing to inquire into the matter before ruling that McDowell could not have new counsel.

¶ 68. McDowell contends that defense counsel's disclosure on the first day of trial was tantamount to a request for new counsel. Although he acknowledges

523

that counsel's request was not specific, McDowell maintains that, "[i]t should have been obvious to all those involved that counsel was no longer wanted as McDowell's attorney." McDowell further submits that the conflict which arose between counsel and client before trial was "too wide a divide to permit meaningful representation."

¶ 69. The State responds that the court of appeals correctly concluded that McDowell did not make a substantial complaint that could reasonably be interpreted as a request for new counsel. Alternatively, it argues that the circuit court did not err in refusing to permit counsel to withdraw based on the facts of the case.

¶ 70. Upon examining the record, we note that defense counsel did not actually move to withdraw on the first day of trial, even though he acknowledged being "fired." Moreover, we recognize that McDowell himself made no request for new counsel, even though he spoke to the circuit court, confirming his understanding that he would benefit by cooperating with his attorney.

¶ 71. Still, like the court of appeals, we "do not endorse the trial court's quick 'hogwash' reaction. A defendant's right to representation must be protected and, even absent an explicit request for new counsel, courts should inquire into what they may reasonably infer is a problem potentially undermining that right." *McDowell*, 266 Wis. 2d 599, ¶ 27, n. 10.

¶ 72. Thus, we employ the factors set forth in *State v. Lomax* to determine whether withdrawal of counsel and the appointment of new counsel was warranted under the circumstances of this case. These include:

> (1) the adequacy of the court's inquiry into the defendant's complaint; (2) the timeliness of the motion; and (3) whether the alleged conflict between the defendant and the attorney was so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case.

*Lomax,* 146 Wis. 2d at 359 (citations omitted).

¶ 73. In addressing the first *Lomax* factor, we acknowledge that the circuit court did not conduct a colloquy to more fully develop the substance of McDowell's complaint. However, as the State notes, this must be set against "the fact that neither [defense counsel] nor McDowell offered any evidence of incompetency or of a conflict that made counsel's continued representation untenable." In light of the record, we agree that the circuit court cannot reasonably be faulted for failing to make a full inquiry.

¶ 74. The second *Lomax* factor supports upholding the circuit court's decision. We have previously noted that "defendants in criminal cases often attempt to secure last-minute substitution of counsel to delay the trial, and the practice has 'plagued' the criminal courts in Milwaukee county." *Kazee,* 146 Wis. 2d at 373. Given the number of adjournments in this case, along with the lack of clear expression on the part of both

defense counsel and McDowell, it is understandable why the circuit court rejected McDowell's eleventh-hour attempt to fire counsel.

¶ 75. Finally, the third *Lomax* factor also favors the circuit court. The record does not support that the alleged conflict between McDowell and defense counsel was so great that it resulted in a total lack of communication, or prevented an adequate defense. Indeed, as the State observes, it seems likely that the court's remarks to McDowell regarding the advisability of cooperating with counsel persuaded him to communicate with counsel. The fact that McDowell disagreed with his attorney over the presentation of his testimony does not, in our view, automatically create "an irreconcilable conflict which leads to an apparently unjust verdict." *State v. Wanta,* 224 Wis. 2d 679, 703, 592 N.W.2d 645 (Ct. App. 1999).

¶ 76. Based on these factors, we cannot conclude that the circuit court erroneously exercised its discretion in denying McDowell new counsel. Accordingly, we reject his claim.

## VI

¶ 77. In sum, we agree with the court of appeals that defense counsel may not substitute narrative questioning for the traditional question and answer format unless counsel knows that the client intends to testify falsely. Absent the most extraordinary circumstances, such knowledge must be based on the client's expressed admission of intent to testify untruthfully. We further determine that attorneys must advise the client, opposing counsel, and the circuit court of the change of questioning style prior to use of the narrative.

¶ 78. In the case before us, we conclude that defense counsel's performance was deficient in two respects: (1) he shifted to narrative questioning without advising his client beforehand; and (2) he used narrative questioning despite believing that his client intended to testify truthfully. We also conclude, however, that McDowell suffered no prejudice under the facts of this case. Finally, we reject McDowell's claim that the circuit court erred in failing to permit him new counsel. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 79. DIANE S. SYKES, J. did not participate.

¶ 80. PATIENCE D. ROGGENSACK, J. (*concurring*). While I agree with the majority opinion's conclusion to affirm the judgment, I write separately because I would hold that: (1) counsel has knowledge that his or her client intends to testify falsely when his or her belief is based on objective uncontradicted facts; (2) counsel's representation of McDowell was not deficient under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), as explained in *Nix v. Whiteside*, 475 U.S. 157 (1986);[1] and (3) counsel with knowledge that his client is about to commit perjury should not passively facilitate it. Accordingly, I respectfully concur.

---

[1] The majority opinion notes that the State has conceded that trial counsel rendered deficient performance at trial. Majority op., ¶ 52. However, while the arguments of counsel are very helpful, they do not restrict our analysis of the legal issues presented on appeal. *Randy A. J. v. Norma I. J.*, 2004 WI 41, ¶ 31 n.15, 270 Wis. 2d 384, 677 N.W.2d 630.

527

## I. BACKGROUND

¶ 81. McDowell, who was convicted of five counts of sexual assault while using a dangerous weapon, as party to the crime, complains he did not have effective assistance of counsel because when he began to tell his version of how his semen came to be mixed with the victim's saliva at the crime scene, defense counsel switched to a narrative form of testimony, instead of assisting McDowell in bringing out all the details of his story. The majority concludes that trial counsel's performance was deficient, although not prejudicial, because in order to refuse to present a defendant's trial testimony in the usual question and answer format, trial counsel must have knowledge that the defendant is going to commit perjury. According to the majority opinion, that knowledge must be based on "the client's expressed admission of intent to testify untruthfully [and the client's admission] must be unambiguous and directly made to the attorney."[2] The majority opinion concludes that the change to a narrative presentation of McDowell's testimony by trial counsel was deficient performance[3] because McDowell had not personally told trial counsel that he was going to testify untruthfully;[4] the beginning of McDowell's testimony was not sufficient to provide "knowledge" that McDowell intended to lie;[5] and even if we were to assume it was

---

[2] Majority op., ¶ 43.

[3] In order to satisfy the *Strickland v. Washington,* 466 U.S. 668 (1984), test for ineffective assistance of trial counsel, a defendant must prove both that counsel's performance was deficient and that the defendant was prejudiced as a result. *Id.* at 687.

[4] Majority op., ¶ 53.

[5] *Id.*

sufficient, counsel should have asked for an adjournment and advised McDowell a second time[6] that the testimony he was about to give would have to be in a narrative form.[7]

## II. DISCUSSION

### A. Standard of Review

¶ 82. A claim of ineffective assistance of counsel is a mixed question of fact and law. *State v. Franklin*, 2001 WI 104, ¶ 12, 245 Wis. 2d 582, 629 N.W.2d 289. We will not overturn a circuit court's findings of fact unless they are clearly erroneous. *Id.* However, whether trial counsel's representation was deficient or prejudicial to a defendant's case are questions of law that we review de novo. *Id.*

### B. Knowledge of Intent to Testify Falsely

¶ 83. Whether defense counsel should assist a defendant in a criminal trial in presenting his testimony to the trier of fact when defense counsel believes that the defendant will testify untruthfully presents a tension between a defendant's right to testify and the

---

[6] At the hearing held under *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979), trial counsel explained, "There was a juncture in discussions that Mr. McDowell had with myself and [Assistant State Public Defender] Deja Vishny on [the day he was going to testify], where there were several statements by Mr. McDowell[, o]ne of which [was] that he would proffer untruthful testimony if it would help him" and he told trial counsel how his story would go. At that time, trial counsel advised McDowell that if he chose to tell that untruthful story, he would have to testify in the narrative, and counsel explained what a narrative form of testimony was.

[7] Majority op., ¶ 52.

truth-seeking function upon which a trial is based. *See Nix,* 475 U.S. at 173. Courts have addressed this tension by applying various quanta of proof to the degree of certainty with which trial counsel holds the belief that the defendant will commit perjury when he or she testifies. *See Commonwealth v. Mitchell,* 438 Mass. 535, 545–46 (S.Ct. 2003). The majority opinion concludes defense counsel would not have sufficient knowledge to refuse to assist a criminal defendant in presenting his testimony, unless the knowledge that the defendant planned to testify untruthfully was obtained by the defendant's own admission of such intent made directly to trial counsel.[8]

¶ 84. McDowell agrees with the majority position, that sufficient knowledge of the intent to commit perjury is present only when the defendant tells his or her attorney that he or she will lie on the stand. The State asks us to conclude that sufficient knowledge may be based on facts obtained from sources other than a defendant's admission, and to apply "firm factual basis" as the necessary quantum of proof for those facts. It cites *Mitchell, supra,* as supportive of its position.

¶ 85. In *Mitchell,* the Massachusetts Supreme Court reviewed various standards of proof applied by courts that have wrestled with deciding on a workable standard for sufficient knowledge by criminal defense counsel that his or her client is planning to commit perjury.[9] The court in *Mitchell* decided to require "a firm basis" in objective fact for counsel's knowledge

---

[8] Majority op., ¶ 43.

[9] In *Commonwealth v. Mitchell,* 438 Mass: 535, 545–46 (S.Ct. 2003), the Massachusetts Supreme Judicial Court noted the following standards have been used for determining when defense counsel has sufficient knowledge for determining that a client is about to commit perjury: a "firm factual basis," *United*

because it concluded that quantum of proof provided a proper balance between a lawyer's duty of candor toward the tribunal, by not aiding a client who intends to testify falsely, and a criminal defendant's right to a vigorous defense. *Mitchell*, 438 Mass. at 546–47. The court also explained that to require too great a quantum of proof, would compel defense counsel to remain silent when a sharp private warning to his or her client could prevent perjury by persuading the client to testify truthfully or not at all. *Id.* at 546.

¶ 86. I agree that a proper balance between maintaining the truth-seeking function of a trial and a defendant's right to a vigorous defense provided through effective assistance of counsel is essential. However, to accomplish that end, I would require knowledge based upon objective, uncontradicted facts as that which is sufficient to show a defendant's intent to present perjured testimony. This standard recognizes that an attorney may have knowledge that his client is about to lie, without the client directly admitting that to counsel. It also strikes a proper balance between the truth-seeking function of a trial and a defendant's right to present a vigorous defense. In my view, applying the majority's standard will result in more perjured testimony than would a standard based on knowledge

States ex rel. Wilcox v. Johnson, 555 F.2d 115, 122 (3d Cir. 1977); "actual knowledge," *United States v. Del Carpio-Cotrina,* 733 F. Supp. 95, 99 (S.D. Fla. 1990); "knowledge beyond a reasonable doubt," *Shockley v. State,* 565 A.2d 1373, 1379 (Del. 1989); "compelling support," *Sanborn v. State,* 474 So.2d 309, 313 n.2 (Fla. Dist. Ct. App. 1985); a "good-faith determination," *People v. Bartee,* 566 N.E.2d 855, 857 (Ill. Ct. App. 1991); and "good cause to believe the defendant's proposed testimony would be deliberately untruthful," *State v. Hischke,* 639 N.W.2d 6, 10 (Iowa 2002).

obtained from objective, uncontradicted facts, and it will place ethical defense attorneys in the position of having to assist with direct examinations of clients whom counsel know are not testifying truthfully.

¶ 87. That standard could include, of course, a statement by the client that he or she intended to relate facts that are not true. It could also be satisfied by objective facts such as McDowell's explanation of how his semen came to be mixed with the victim's saliva at the crime scene. To explain: the victim told police that one of her assailants had ejaculated in her mouth during his sexual assault and she spat the ejaculate at the crime scene. The DNA analysis of the specimen from the crime scene contained DNA from the victim and DNA from McDowell. In McDowell's version of the events, his girlfriend performed fellatio on him in the same location as that in which the sexual assault occurred. McDowell said he ejaculated at the scene, with his ejaculate landing on the same spot where the victim had spat the ejaculate from her assailant, thereby mixing her saliva with his ejaculate. Aside from the implausibility of McDowell being able to hit the exact same spot with his ejaculate as the victim had spat the assailant's ejaculate at the time of the sexual assault, McDowell's testimony cannot be true because if it were, there would be DNA from three persons in the sample the police had examined: DNA from the victim, DNA from her assailant and DNA from McDowell. However, the specimen contained DNA from only two sources: the victim and McDowell. In my view, that is sufficient objective, uncontradicted facts such that when McDowell began to relate what supposedly occurred with his girlfriend, defense counsel had a sufficient quantum of proof to have "knowledge" that McDowell was about to commit perjury.

## C. Deficient Performance

¶ 88. Counsel has rendered deficient performance when his or her representation falls below an "objective standard of reasonableness." *Franklin,* 245 Wis. 2d 582, ¶ 13 (quoting *Strickland,* 466 U.S. at 688). In *Nix,* cited earlier, the United States Supreme Court, in the context of a claim of ineffective assistance of counsel based upon an attorney's response to a client's proposed perjury, discussed whether that attorney's performance was deficient.[10]

¶ 89. In *Nix,* the defendant, Whiteside, was charged with murder. When Whiteside's attorney began representing him, he obtained a statement from Whiteside that he had stabbed the victim as the victim "was pulling a pistol from underneath the pillow on the bed." *Nix,* 475 U.S. at 160. However, upon further investigation by counsel, Whiteside explained that he had not really seen a gun; no gun was found on the premises; and no one who was present at the time of the stabbing had seen a gun.

¶ 90. Shortly before trial, Whiteside, for the first time, told counsel that he had seen "something metallic" in the victim's hand. When asked about what he meant, Whiteside responded, "[I]n Howard Cook's case there was a gun. If I don't say I saw a gun, I'm dead." *Id.* at 161. Trial counsel explained to Whiteside that such testimony would be perjury and that he would not assist him in providing perjured testimony. Trial counsel also informed Whiteside that if he insisted on

---

[10] As stated by the Supreme Court, the issue was, "whether the Sixth Amendment right of a criminal defendant to assistance of counsel is violated when an attorney refuses to cooperate with the defendant in presenting perjured testimony at his trial." *Nix v. Whiteside,* 475 U.S. 157, 159 (1986).

testifying that he saw "something metallic" in the victim's hand, trial counsel would advise the court that in his view Whiteside was going to commit perjury and that counsel would probably be permitted to impeach that testimony before the jury. *Id.*

¶ 91. Based on counsel's statements, Whiteside testified truthfully and did not say he saw "something metallic" in the victim's hand. Whiteside said that the reason he stabbed the victim was because he was afraid he was going to be shot when he thought the victim was reaching for a gun, thereby raising the issue of self-defense. Testimony also came in that the victim had been seen with a sawed-off shotgun on other occasions and that the police search of the apartment could have been careless and missed a weapon.

¶ 92. Whiteside was convicted of second-degree murder, which was affirmed by the Iowa Supreme Court. Whiteside then sought review of his conviction by habeas corpus in the federal district court. The district court affirmed, but the Eighth Circuit Court of Appeals reversed. The Eighth Circuit concluded:

> [C]ounsel's actions in threatening to withdraw, advise the state trial judge and testify against appellant if appellant testified falsely, impermissibly compromised appellant's right to effective assistance of counsel. Despite counsel's legitimate ethical concerns, counsel's actions were inconsistent with the obligations of confidentiality and zealous advocacy.

*Whiteside v. Scurr*, 744 F.2d 1323, 1329 (8th Cir. 1984). The Supreme Court granted certiorari and took the Eighth Circuit to task on its legal reasoning. The Supreme Court concluded that, "[A]lthough counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking

steps or in any way assisting the client in presenting false evidence or otherwise violating the law." *Nix,* 475 U.S. at 166. The Supreme Court emphasized that lawyers have a dual ethical obligation: an obligation to the client for zealous advocacy within the bounds of the law and an obligation to the system of justice as a whole as an officer of the court. *Id.* at 168–69. It explained:

> These standards confirm that the legal profession has accepted that an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence. This special duty of an attorney to prevent and disclose frauds upon the court derives from the recognition that perjury is as much a crime as tampering with witnesses or jurors by way of promises and threats, and undermines the administration of justice.

*Id.* (footnote and citations omitted). Based on these principles, the Supreme Court concluded that counsel had not rendered deficient performance. *Id.* at 171.

¶ 93. In my view, under the standards set in *Nix,* McDowell's trial counsel did not render deficient performance when he switched to a narrative format for the presentation of McDowell's testimony. Trial counsel had objective, uncontradicted facts sufficient to have knowledge that when McDowell began testifying about what he and his girlfriend did that he was about to commit perjury. As I will explain below, trial counsel went further than should be required in the face of impending perjury.

## D. Passive Toleration of Perjury

¶ 94. The majority concludes that when trial counsel has knowledge that a client will commit perjury during his or her testimony because the client has told him that he or she will do so, he must nevertheless continue to represent the client; call the client to the stand to testify; and tell the client that his or her testimony must be presented in the narrative format and what a narrative format means.[11] The majority cites *People v. Johnson,* 62 Cal. App. 4th 608, 621–26 (1998) as support for this being the best "option" under the circumstances.[12] However, the United States Supreme Court explained in *Nix* that not only was a lawyer not to assist in the presentation of perjured testimony, but a lawyer was not to "passively tolerate" a client's giving false testimony because to do otherwise was inconsistent with the purpose of a trial, what "we have long called a 'search for the truth.' " *Nix,* 475 U.S. at 171.

¶ 95. In concluding that lawyers should not "passively tolerate" the presentation of perjured testimony, the United States Supreme Court rejected the approach of the majority in the case before us, *e.g.,* that a lawyer should explain to the client how to do narrative testimony; call the client to the stand and passively facilitate perjured testimony. *Id.* at 170 n.6. The Court in *Nix* also pointed out that this approach in treating a client's intent to present perjured testimony has been rejected by most courts and rejected by the *Model Rules of Professional Conduct. Id.* at 170.

---

[11] Majority op., ¶ 47.

[12] *Id.,* ¶ 47 n. 17.

¶ 96. While it is beyond dispute that a defendant has the right to testify in his own defense, *State v. Fritz,* 212 Wis. 2d 284, 292, 569 N.W.2d 48 (Ct. App. 1997), that right is not absolute. As the United States Supreme Court has explained:

> Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying *falsely.* ... Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully.

*Nix,* 475 U.S. at 173. Therefore, the United States Supreme Court concluded that for defense counsel to actively persuade a criminal defendant to testify truthfully or not to testify at all by explaining that he or she will withdraw from further representation if the client persists in a claimed right to tell a story counsel knows is false was the proper route to follow because it "deprives the defendant of neither his right to counsel nor the right to testify truthfully." *Id.* at 173–74. I fully agree with this rationale, which has been the rule of law in the United States Supreme Court in all cases this writer could find. The truth is the foundation of our justice system, as Justice Benjamin Cardozo so aptly stated:

> There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.

*Clark v. United States,* 289 U.S. 1, 15 (1933).

¶ 97. Accordingly, I would conclude that counsel should follow the example of trial counsel in *Nix* who, by explaining to Whiteside that counsel would not tolerate perjured testimony and that if necessary he

would disclose Whiteside's perjury to the court or withdraw, persuaded Whiteside to testify truthfully. In so doing, Whiteside maintained his right to testify and counsel was not put in the position of suborning perjury.

¶ 98. Accordingly, for the reasons set forth above, I respectfully concur.