Ocwen Loan Servicing, LLC f/k/a Ocwen Federal Bank, FSB, Plaintiff-Respondent,

v.

Kraig Williams and State of Wisconsin, Department of Workforce Development, Defendants,

Patricia Watson, Defendant-Appellant.

Court of Appeals

*No. 2007AP260. Submitted on briefs August 7, 2007. —Decided September 27, 2007.*

2007 WI App 229

(Also reported in 741 N.W.2d 474.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Richard L. Bolton* of *Boardman, Suhr, Curry & Field LLP*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Penny G. Gentges* and *Arthur M. Moglowsky* of *Bass & Moglowsky, S.C.*, Milwaukee.

Before Dykman, Vergeront and Bridge, JJ.

¶ 1. DYKMAN, J.   Patricia Watson appeals from a judgment concluding that Ocwen Loan Servicing, LLC, was entitled to equitable subrogation, thereby making

Ocwen's mortgage superior to Watson's lien on real estate owned by Kraig Williams. Watson contends that the trial court erred in applying equitable subrogation to grant priority to Ocwen, and that her lien has priority because it occurred prior in time to Ocwen's mortgage. We conclude that the trial court properly applied the doctrine of equitable subrogation to give priority to Ocwen's mortgage, and therefore affirm.

## Background

¶ 2.  In January 2002, Kraig Williams, purporting to act on behalf of a company called America's Best Buildings, LLC,[1] accepted Patricia Watson's offer to purchase real estate located in Johnson Creek, Wisconsin. Watson and Williams agreed that Williams would construct a custom home on the property for Watson. In order to obtain the land and construct the home, Williams, again purporting to represent America's Best, obtained a $161,668 loan from Cambridge State Bank in March 2002. To secure the loan, America's Best gave Cambridge State Bank a construction mortgage on the Johnson Creek Property, which Cambridge recorded

---

[1] The parties agree that America's Best had not filed its articles of organization under WIS. STAT. § 183.0204 (2005–06) when Williams initially purported to take actions on its behalf, and that it did so at some later time. It is also undisputed that the stated member signing all documents on behalf of America's Best was Williams. The parties disagree over whether America's Best later ratified the actions Williams took on its behalf or whether Williams is personally liable for those actions. The trial court made no finding as to this dispute. We therefore use the name "America's Best" to refer to the company Williams purported to represent without making any conclusions as to its legal significance.

All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

with the Register of Deeds. Williams signed a continuing unlimited guaranty on the loan, personally guarantying America's Best's debt to Cambridge. Williams used the Cambridge loan funds to purchase the property, and Village Walk, LLC, deeded the property to America's Best.

¶ 3.   In July 2002, Watson filed an action against America's Best and Williams[2] for breach of contract for failing to construct the home in Johnson Creek according to their agreement and seeking an equitable lien on the property. Watson also filed a *lis pendens* that same month. In November 2002, Cambridge filed an action against Williams, America's Best, and Watson to foreclose its mortgage on the Johnson Creek property.

¶ 4.   Williams then obtained a loan in the amount of $200,000 from Fremont Investment & Loan. On the date the loan was settled, Williams deeded the Johnson Creek property from America's Best to Williams personally. Williams gave Fremont a mortgage on the property to secure the loan. The loan from Fremont was used, in part, to satisfy the Cambridge mortgage.[3] Both the deed to Williams and the mortgage to Fremont were recorded in the Register of Deeds.

---

[2] The original complaint named only America's Best as a defendant. An amended complaint, filed in August 2002, also named Williams.

[3] Watson argues that the trial court erroneously found that all of the Fremont loan funds, other than closing costs, were used to pay the Cambridge loan. Watson concedes that at least a portion of the Fremont loan funds were used to satisfy the Cambridge mortgage, but asserts that Fremont lent Williams additional funds as well. We agree that the record indicates that the Fremont loan was not limited to paying the Cambridge mortgage; the Fremont loan to Williams was for $200,000, and the Cambridge mortgage payoff was $172,815.65. Watson does not explain why this fact is significant. To the extent that she

¶ 5. Ocwen Federal Bank, as the loan servicer for the current owner and holder of the Fremont mortgage, filed this action in January 2004 to foreclose its mortgage on the Johnson Creek property, naming Williams and Watson as defendants.[4] Williams did not respond to the complaint and the action proceeded as to the priority of interests between Watson and Ocwen. Later in January 2004, Watson was granted a default judgment in her action against Williams and America's Best. Watson was awarded $117,415, of which $77,000 was determined to be enforceable as an equitable lien on the Johnson Creek property and deemed to have attached in January 2002. Watson docketed her lien in February 2004. In Ocwen's foreclosure action, the trial court determined that Ocwen's interest, although junior in time to Watson's interest, was equitably subrogated to the priority position of Cambridge. Watson appeals.

### Standard of Review

¶ 6. We will not disturb the trial court's findings of fact unless they are clearly erroneous. *State v. McDowell*, 2004 WI 70, ¶ 31, 272 Wis. 2d 488, 681

---

implies that the loan could not have been intended to take the place of the Cambridge mortgage, we reject this argument as contrary to the supreme court's analysis in *Rock River Lumber Corp. v. Universal Mortgage Corp. of Wisconsin*, 82 Wis. 2d 235, 244, 262 N.W.2d 114 (1978) (noting that the supreme court had approved granting subrogation where a lender "had advanced money for, *among other things,* the satisfaction of an existing mortgage" under an agreement that the lender would then have a first mortgage (emphasis added) (citing *Home Owners' Loan Corp. v. Dougherty*, 226 Wis. 8, 275 N.W. 363 (1937))).

[4] The other named defendants are not relevant to this appeal.

N.W.2d 500. Whether the law of equitable subrogation applies to the facts of this case is a question that we decide independently on review. *Millers Nat'l Ins. Co. v. City of* Milwaukee, 184 Wis. 2d 155, 164, 516 N.W.2d 376 (1994). "In doing so, we apply principles of equity to the facts before us." *Ives v. Coopertools*, 208 Wis. 2d 55, 63, 559 N.W.2d 571 (1997).

*Discussion*

¶ 7.   "Subrogation is an equitable doctrine invoked to avoid unjust enrichment, and may properly be applied whenever a person other than a mere volunteer pays a debt which in equity and good conscience should be satisfied by another." *Rock River Lumber Corp. v. Universal Mortgage Corp. of* Wisconsin, 82 Wis. 2d 235, 240–41, 262 N.W.2d 114 (1978). To invoke subrogation, a lender must have either lent money to a debtor to pay a debt on which the lender was secondarily liable, or must have lent the money to protect the lender's own interest, or must have entered into an agreement that the lender was to have security on the debt. *Id.* at 241. Subrogation "is applied or denied upon equitable principles. The object of subrogation is to do substantial justice independent of form or contract relation between the parties." *Id.* at 241–42 (citations omitted).

¶ 8.   Watson argues that (1) Williams's personal guaranty on the Cambridge loan defeats Ocwen's claim for equitable subrogation; (2) the loan Williams obtained from Fremont to pay the Cambridge mortgage was a purchase money loan and not a refinancing, making equitable subrogation inapplicable; (3) allowing equitable subrogation in this case would allow equitable subrogation in every purchase of real estate in Wiscon-

sin and thus have a deleterious effect on the transferability of real estate; and (4) equity does not favor subrogation because Watson paid money to Williams earlier in time than even the Cambridge mortgage[5] and Fremont was aware of Watson's interest in the property when it lent money to Williams. We reject each of Watson's contentions.

¶ 9. The parties agree that the Cambridge loan was purportedly made to America's Best, and that Williams was primarily liable on that loan pursuant to his unlimited personal guaranty. They also agree that Fremont lent money to Williams personally, and that some of the proceeds of that loan were used to satisfy the Cambridge mortgage. Watson argues that the fact that Williams was personally liable on the Cambridge loan renders equitable subrogation inapplicable, because equitable subrogation does not apply to payment of a primary obligation. In support, Watson cites *Beach v. First Union National Bank of North Carolina*, 119 B.R. 646 (W.D. Wis. 1990). We disagree, and conclude that *Beach* is distinguishable on its facts.

¶ 10. In *Beach*, First Union National Bank lent money to Carley Capital Group, secured by real estate. *Id.* at 647. Carley also entered into a contract with Beach (among others) for Beach to arrange a letter of credit with First Wisconsin National Bank to further secure Carley's loan from First Union. *Id.* Carley later drafted against the letter of credit with the bank, indebting Beach to First Wisconsin. *Id.*

¶ 11. Beach filed a complaint in the ensuing bankruptcy adversary proceedings, alleging that it was en-

---

[5] Watson concedes that Cambridge's mortgage had priority over her lien, *see* Wis. Stat. § 706.11, but argues that because she paid money to Williams prior to Cambridge's mortgage, equity favors her.

titled to equitable subrogation to the position of First Union against Carley. *Id*. The bankruptcy court disagreed, explaining that Beach was not entitled to equitable subrogation because its obligation through the letter of credit was primary rather than secondary. *Id*. at 649. The court stated that "the Wisconsin Supreme Court [has] noted that subrogation is generally available when a person 'pays a debt which in equity and good conscience should be satisfied by another.' " *Id*. (citing *Rock River Lumber*, 82 Wis. 2d at 240). Thus, "subrogation is not available as a result of the payment of a principal obligation under a letter of credit." *Id*.

¶ 12.   The facts in *Beach* are easily distinguished from this case. Beach, a party with primary liability on Carley's debt through a letter of credit, sought equitable subrogation to the position of First Union against Carley based on its obligation to pay the original debt. The analogous situation would be Williams seeking equitable subrogation to Cambridge's position against America's Best without obtaining a second loan. Here, Ocwen, as a second lender to Williams to pay the original Cambridge debt, seeks equitable subrogation to the position of Cambridge as against Williams. We do not agree with Watson that *Beach* is instructive.[6]

¶ 13.   Ultimately, Watson's "secondary liability" argument makes little sense. Watson repeatedly argues that Williams's primary obligation on the Cambridge loan defeats Ocwen's claim for equitable subrogation. At the same time, Watson argues that the Cambridge

---

[6] The two other cases Watson cites in support, *Tudor Development Group, Inc. v. United States Fidelity & Guaranty Co.*, 968 F.2d 357 (3rd Cir. 1992), and *Michigan Hospital Service v. Sharpe*, 63 N.W.2d 638 (Mich. 1954), also present factually distinct situations that do not guide the outcome of this case.

loan was made to America's Best, not Williams, apparently conceding that if the original loan had been made to Williams, equitable subrogation would apply under *Rock River Lumber*. However, Watson does not explain why primary liability as the principal debtor does not defeat a claim for equitable subrogation by a second lender, but primary liability through a personal guaranty does. We see no reason to draw such a distinction.

¶ 14.  Moreover, even if a party does not claim secondary liability or payment to protect its own interests, it may claim equitable subrogation based on an agreement between the parties that the lender will have security. *See Rock River Lumber*, 82 Wis. 2d at 241–42. In *Rock River Lumber*, Wisconsin Savings and Loan lent money to Mint Enterprises, secured by a mortgage on property owned by Mint. *Id*. at 238. After construction began on the property, Mint refinanced its debt by obtaining a loan from Universal and using it to satisfy its mortgage to Wisconsin Savings and Loan. *Id*. at 239. Rock River Lumber brought an action to foreclose its construction lien on the property, and Universal brought an action to foreclose its mortgage. *Id*. at 240. After a consolidated trial, the trial court determined that Universal was entitled to equitable subrogation to the position of Wisconsin Savings and Loan. *Id*. Rock River Lumber appealed, and the supreme court affirmed. *Id*. at 240–47.

¶ 15.  The *Rock River Lumber* court explained that although Universal did not claim secondary liability or that it acted to protect its own interests, it argued that there was an agreement between Mint and Universal that Universal would have a first mortgage on the property. *Id*. at 241. Thus, "the trial court found that Mint had given Universal a first mortgage and that

781

Universal was entitled to subrogation as one advancing money for the discharge of an existing mortgage under a definite agreement that the lender have security in the form of a first mortgage." *Id.* at 243 (citation omitted). The supreme court agreed. *Id.* at 245.

¶ 16.  Watson argues, however, that here there was no definite agreement for Fremont to take a first mortgage and, even if there was, any agreement was made between Fremont and Williams rather than the original debtor, America's Best. Watson further argues that *Rock River Lumber* is only applicable to refinancing cases, and Williams obtained the loan from Fremont not as a refinance but as a purchase money loan to obtain the Johnson Creek property from America's Best. Thus, Watson contends, this case presents a traditional real estate purchase where the seller (America's Best) had its own mortgage (via Cambridge) and the buyer (Williams) obtained his own mortgage from a new lender (Fremont). Watson argues that the facts do not present a refinancing of an original mortgage as required by *Rock River Lumber*, and that allowing subrogation here would allow subrogation following every purchase of property, because every buyer's lender could be equitably subrogated to the position of every seller's mortgagee. We disagree.

¶ 17.  Watson's arguments misconstrue the facts as found by the trial court. First, the trial court found that the Fremont loan to Williams was intended to be secured by a first lien, purchase money mortgage on the property. This is a finding of fact supported by the record, and we will therefore not disturb it. *See id.* at 242. Wayne Peterson, the loan broker for the loan from Fremont to Williams, testified that Williams specifically applied for a refinancing loan. The loan disbursement statement shows that the loan was used, in part, to pay

the existing Cambridge mortgage on the property. Peterson also testified that the underwriting sheet from Fremont stated that the loan to Williams had to be a first mortgage, and that Fremont only advanced loans for second mortgages if the first mortgage was to Fremont; otherwise, it only dealt in first mortgages. The loan's closing instructions state that the loan could not be closed without verification that Fremont would have a first lien position on the property.[7] Thus, the record supports the trial court's finding that there was an agreement between Fremont and Williams that Fremont would take a first mortgage on the property.

¶ 18.   Also, this is not a traditional purchase of property scenario, where the buyer is a stranger to the seller's mortgage. As Watson points out, Williams was personally liable on America's Best's mortgage to Cambridge through his personal guaranty, and the only person associated with America's Best was Williams. Further, before it would issue the loan to Williams, Fremont required Williams to deed the Johnson Creek property from America's Best to Williams personally. Thus, when Williams obtained the loan from Fremont,

---

[7] Watson points out that the loan closing instructions from Fremont required "verification" that Fremont would have a first lien position on the property, and argues that Fremont's failure to obtain verification that Watson's lien was extinguished before issuing its loan to Williams establishes it could not reasonably have expected to obtain a first lien position on the property. She further points out that the loan closing instructions do not specify that Fremont was to take an assignment of the Cambridge loan, and thus the transaction cannot be categorized as such. We disagree. The trial court's finding that the Fremont loan was made between Fremont and Williams with a definite agreement that Fremont would receive a first lien position is amply supported by the record and therefore not clearly erroneous.

he was the owner of the property and personally liable on the original mortgage, and therefore able·to provide Ocwen "a justifiable expectation that [it would] have security equivalent to that which [its] advances . . . discharged" and that the new mortgage "was executed in substitution for the existing mortgage." *See id.* at 241–42. Because "[e]quity will treat such a transaction as tantamount to an assignment of the original security," *see id.* at 241, there must be a relationship between mortgagee and debtor, as here. Allowing equitable subrogation in this case does not provide a basis to subrogate every buyer's lender to the position of the seller's mortgagee upon purchase of real estate and satisfaction of the original mortgage.[8]

¶ 19.   We turn, then, to equitable considerations. Subrogation is not available where "the rights of any third party have intervened in such a way as to render it inequitable to grant subrogation." *Id.* at 245. Watson asserts that from an equitable perspective, her lien should be superior to even Cambridge's because she advanced funds earlier in time than Cambridge did.

---

[8] Watson argues that under *Crawley v. Aurora Loan Services*, 318 B.R. 512 (W.D. Wis. 2004), subrogation is not available where the lender receives the agreed security. We do not agree that Crawley is dispositive. There, the lender received but failed to record its mortgage, and tried to correct its mistake by seeking equitable subrogation to the position of the original mortgagee. *Id.* at 515. However, "[t]here [was] no definite agreement for subrogation, and the balancing of equities [did] not support equitable subrogation." *Id.* Additionally, Watson's claim that Ocwen may not be subrogated to Cambridge's position because the Cambridge loan was extinguished is unavailing. *See Rock River Lumber*, 82 Wis. 2d at 239, 247 (allowing subrogation where a lender advanced money for the debtor to satisfy an existing mortgage).

Watson also asserts that equity is in her favor because the Fremont loan exceeded the amount necessary to pay the Cambridge loan and Fremont's own negligence caused it to obtain a mortgage that was subject to prior liens on the property. We disagree.

¶ 20. Watson concedes that her lien was subordinate to the Cambridge mortgage. The fact that Watson advanced money earlier in time than Cambridge does not render it inequitable to subrogate Ocwen to Cambridge's position. In fact, subrogation does not affect Watson's interests at all, since she is in the same position she would have been had the loan to Williams for satisfaction of the Cambridge mortgage never taken place.[9] Similarly, we fail to see how subrogation is inequitable based on Fremont advancing Williams additional money beyond the amount needed to satisfy the Cambridge mortgage.

¶ 21. We agree that one factor to consider in our weighing of equities is that Fremont was aware that there was a pending action between Watson and Williams when it lent money to Williams to satisfy the Cambridge mortgage. Watson argues that Fremont was grossly negligent in issuing the loan to Williams because the loan closing instructions required verification that Fremont would be in a first lien position and the title company instructed Fremont to ensure that Watson's *lis pendens* be released prior to closing. As Watson concedes, however, Fremont's negligence is not dispositive of whether equitable subrogation should be granted.[10] *See Iowa County Bank v. Pittz*, 192 Wis. 83,

---

[9] *See infra* note 11.

[10] Watson cites a federal case, *First Federal Savings Bank of Wabash v. United States*, 118 F.3d 532 (7th Cir. 1997), which interprets Indiana's equitable subrogation law, in support of her

91, 211 N.W. 134 (1926) ("[I]nstances for the application of [equitable subrogation] can hardly ever exist in the absence of some negligence on the part of one seeking such relief.").

¶ 22. Because "[s]ubrogation is an equitable doctrine invoked to avoid unjust enrichment," our focus is on whether Watson would be unjustly enriched absent application of the doctrine and whether Watson's interests "have intervened in such a way as to render it inequitable to grant subrogation." *Rock River Lumber*, 82 Wis. 2d at 240–45.

¶ 23. It is undisputed that without subrogating Ocwen to Cambridge's priority position, Watson would benefit by moving up in priority in the amount of $172,815.[11] Watson does not argue that the trial court erred in finding that she would be unjustly enriched absent subrogating Ocwen to Cambridge's position. She argues only that her rights have intervened in such a way as to render subrogation inequitable. We disagree.

¶ 24. Watson's interest was indisputably subordinate to Cambridge's prior loan to Williams. Subrogating Ocwen to Cambridge's position does not disturb Watson's priority position; Watson is not "one relying

proposition that Fremont's negligence prevents subrogation in this case. Because that case did not address Wisconsin's focus on unjust enrichment, we decline to address it.

[11] Watson argues that equity does not weigh in Ocwen's favor because Ocwen claimed $256,352.78 as outstanding on its loan to Williams, which is $84,000 more than the payoff to Cambridge in the amount of $172,815. However, the trial court ordered that Ocwen's interest be subrogated to Cambridge's position in the amount of $172,815, and that the amount owing to Ocwen in excess of that amount be subordinate to Watson's equitable lien of $77,000.

786

upon the extinguishment of the prior mortgage nor . . . one who has innocently placed [her]self in a position of disadvantage and would be injured by the application of the doctrine." *Id.* at 246 (citation omitted). Watson does not argue that she acted in reliance upon the extinguishment of the Cambridge mortgage or that her lien arose in any way connected to the Fremont loan. In balancing the equities, we agree with the trial court that Watson is not prejudiced by placing her in the same position that she occupied before Williams obtained the Fremont loan to pay his debt to Cambridge. Ocwen is therefore entitled to be subrogated to the position of Cambridge by virtue of the agreement between Williams and Fremont that Fremont would take a first mortgage on the property. Accordingly, we affirm.

*By the Court.*—Judgment affirmed.