COURT OF APPEALS
DECISION
DATED AND FILED

July 27, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1105-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF961

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ANGELINA M. HANSEN,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: VINCENT R. BISKUPIC, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1     HRUZ, J. Angelina Hansen appeals a judgment of conviction, following a jury verdict, for criminal contempt of court in relation to her violation of a family court order setting the conditions under which she could exercise physical placement with her children. Hansen visited her children at school during

their lunch period under circumstances where she was not entitled to exercise physical placement. She contends the trial evidence was insufficient, as a matter of law, to support her contempt conviction, because the jury was repeatedly and erroneously told the order restricted her from merely "visiting" or having "visitation" with those children. Hansen argues that, as a statutory matter, "physical placement" does not encompass a parent's mere "visit" with his or her child, even if the parent intentionally interacted with the child. For a parent to have exercised physical placement, Hansen contends, that parent must also have actually made decisions about a child's daily care.

¶2    Consistent with ***Rick v. Opichka***, 2010 WI App 23, 323 Wis. 2d 510, 780 N.W.2d 159, we conclude that the Wisconsin Statutes do not provide for a parent's statutory "visitation" with his or her children but instead provide for physical placement with the children. Court-ordered "physical placement," as that term is defined in WIS. STAT. § 767.001(5) (2019-20),[1] grants a noncustodial parent, such as Hansen, the following two rights that may only be exercised in accordance with the applicable court order: (1) to be physically present with a child; and (2) to make routine daily decisions regarding the child's care, consistent with the major decisions made by a person having legal custody of the child. As explained in more detail below, under existing law and common sense, the first of these two rights includes the concept of "visiting"—or otherwise personally interacting with—a child. And contrary to Hansen's legal contention, we hold that a parent exercises physical placement rights if he or she is physically present with his or her children and in a position to make decisions regarding their daily care.

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

2

Under such circumstances, a fact finder may conclude, without needing to divine whether (or how) such care decisions actually occurred, that a parent violated a physical placement order.

¶3 Only intentional violations of such an order, however, can rise to the level of criminal contempt. *See* WIS. STAT. § 785.01(1). In this case, Hansen was permitted to have a single, two-to-four-hour in-person interaction with her children each week, and only when arranged in advance and supervised. No error occurred when the phrase "physical placement" was used interchangeably with "visitation," or the like, throughout the trial because Hansen had no right to be physically present with her children at their school and in a position where she could make decisions regarding their care without supervision and approval for the visit. By coming to her children's school without permission, sitting with her children while they ate lunch, and deceiving school staff regarding her identity, the jury could properly find that Hansen intentionally violated the family court order. Therefore, Hansen's contempt conviction on this record is valid.

¶4 We also conclude that Hansen's ineffective assistance of counsel claims fail. Hansen asserts that these claims require the vacation of her other two convictions and a new trial on those charges—i.e., second-degree recklessly endangering safety and obstructing an officer—both of which relate to an altercation between Hansen and a law enforcement officer in the parking lot of her children's school. Hansen first claims that her counsel was deficient by failing to object to alleged mischaracterizations of the family court order. That claim, however, is dependent on her substantive arguments of error, which we reject on the merits. Hansen's second ineffective assistance claim regarding counsel's failure to play a video of her post-arrest interrogation with law enforcement fails

because it overstates the applicable evidence, and because her counsel reasonably chose not to play the video at trial. Accordingly, we affirm.

## BACKGROUND

¶5 The relevant facts are largely undisputed. On November 4, 2016, Hansen went to her triplets' elementary school during the lunch hour and sat with them at their table. The children were fourth graders, and Hansen stated she went there to "hug and tell them [she] loved them." At the time, Hansen was a noncustodial parent of the children subject to a temporary order issued by a Shawano County family court commissioner, which provided:

> Pending report of guardian ad litem, and further order of the Court, [t]emporary physical placement is as follows: … Father shall have primary physical placement of the children. Mother shall have supervised placement only, once per week for 2 to 4 hours each time as can be arranged to be supervised by Parent Connection or Family Services or another supervisor acceptable to Father.

¶6 When a teacher approached Hansen and asked if she was the children's mother, Hansen falsely represented that she was their aunt. The teacher then asked Hansen to follow her to the school's main office to sign in as a visitor. Hansen instead immediately left the building, but she returned a short time later and apparently signed, albeit illegibly, the school's sign-in form and left again.

¶7 In the school parking lot, Hansen became involved in an altercation with the school's law enforcement liaison officer. The liaison officer and school district superintendent had both approached Hansen in the lot as she was walking away from the school. The officer identified himself as such and called out that he wanted to talk with Hansen, but, after providing false information to the officer, she continued to her vehicle and started the engine. The officer stood in front of

4

the vehicle to prevent Hansen from pulling out of her parking spot. This encounter lasted several minutes, with the officer asking Hansen to exit the vehicle and talk with him, while Hansen repeatedly backed up the vehicle and moved it forward toward the officer. Eventually, Hansen's movement toward the officer caused him to move quickly out of the way to avoid being hit, and Hansen then exited the parking lot.

¶8 According to the liaison officer, Hansen's vehicle made glancing contact with his right side during that exit. The superintendent witnessed this entire episode, and she photographed and videotaped moments during it. Indeed, during the superintendent's trial testimony, an approximately fifteen-second-long video was entered into evidence depicting Hansen revving her vehicle's engine and fleeing from the area.

¶9 The State charged Hansen with three criminal offenses, all arising from her visit to her children's school: (1) contempt of court for violating the family court order (for having unapproved and unsupervised contact with her children); (2) second-degree recklessly endangering safety (for her actions in the vehicle); and (3) obstructing an officer (for providing false information to the school liaison officer and disobeying repeated orders from him). A jury convicted Hansen of all three counts. The circuit court withheld sentence on all counts and placed Hansen on four years' probation with various conditions.

¶10 Regarding the contempt of court charge, the applicable family court order was received into evidence at Hansen's trial. As relevant to Hansen's primary arguments on appeal, throughout her trial the order was described as prohibiting her from "visiting" the children, and Hansen's counsel never objected to that characterization. Specifically:

- The children's father (Hansen's ex-husband) stated that the order pertained to "supervised visits." The State used the same terminology during its questioning of the father.

- The liaison officer testified that he was "aware" that "there needed to be supervised visitation" and that the ex-husband had told the school that Hansen was "not allowed in school without someone present."

- A sheriff's deputy testified about Hansen in a manner suggesting she needed supervision or permission from her ex-husband to "visit" the children.

- When Hansen testified, her counsel also questioned her in terms of "supervised visits" and the need for supervision or her ex-husband's permission.

- On cross-examination, after referencing the family court order, the State asked Hansen if she "[was] ordered to have supervised visits," to which she answered, "[c]orrect."

- Later during cross-examination, Hansen was asked whether "that order that you got from Shawano County said that you had to clear any visitation or supervised placement with your ex," to which she answered, "[y]es."

- The State also showed Hansen a copy of the family court order and asked her "is there anything under that section that says that you can have a brief visit at the school with your children?"

- During jury instructions, the circuit court told the jury that the State had to prove that "a court ordered the defendant to have only supervised visitation with her children."

- In closing argument, the State again indicated that the family court "ordered her to have supervised visitation with her children," and he repeatedly used the terminology of "visits" instead of "physical placement."

- In her own closing, Hansen's counsel said that Hansen had "wanted to visit her kids that day" and "knew it had to be supervised."

¶11 Hansen filed a postconviction motion challenging all three of her convictions, seeking a judgment of acquittal on the contempt count and a new trial on the other two counts. In her motion, she alleged that there was insufficient

6

evidence to convict her of contempt because the family court order, as a matter of law, did not prohibit her from visiting her children, including at their school. Hansen also alleged that her trial counsel performed deficiently by not investigating whether the family court order actually proscribed her conduct and by not raising that issue. Finally, she alleged her counsel was ineffective by not using the video of her law enforcement interrogation to impeach the interrogating officer's rebuttal testimony regarding her having "nudged" the school liaison officer with her vehicle when she attempted to leave the school parking lot.

¶12 After a *Machner*[2] hearing, the circuit court issued a written order denying Hansen's postconviction motion. The court denied Hansen's claims regarding the mischaracterizations of the family court order, relying on *Opichka* to conclude that "physical placement" is not distinct from "visitation" in the context of parents. Accordingly, the court rejected all of Hansen's postconviction claims related to the family court order, including her ineffective assistance claim. With respect to Hansen's ineffective assistance claim regarding the video of her interview, the court found that counsel's decision not to impeach the interrogating officer's testimony with the video was reasonable under the circumstances. Hansen now appeals.

## DISCUSSION

### I. *Validity of Hansen's Contempt of Court Conviction*

¶13 Hansen first challenges her contempt of court conviction for violating the family court order establishing the conditions of her exercising

---

[2] *See* ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

physical placement with her children. She argues that her act of merely visiting her children at their school did not—and could not, as a matter of law—violate the family court order. Moreover, she contends that because the parties, the witnesses, the circuit court, and the jury all considered Hansen's act of visiting her children as violating the family court order, the State's case fundamentally failed—i.e., she was improperly convicted of disobeying a court order when all of the evidence establishes that she complied with it. Accordingly, Hansen asks this court to reverse her conviction and instruct the circuit court on remand to enter a judgment of acquittal on the contempt charge.

¶14 Hansen's claim is couched in terms of the sufficiency of the evidence, and the State largely treats it as such. In reality, her argument is one of statutory interpretation: namely, what is the meaning of the term "physical placement" in the family court order.[3] And contrary to the State's argument, Hansen is not collaterally challenging either the validity or the scope of the family court order. Again, she is simply contending that she complied with the order as written.

¶15 Hansen correctly focuses her argument on the statutory definition of physical placement. WISCONSIN STAT. § 767.001(5) defines "physical placement" as "the condition under which a party has the right to have a child physically placed with that party and has the right and responsibility to make, during that placement, routine daily decisions regarding the child's care, consistent with the

---

[3] For this reason, the State's arguments focusing on Hansen's various admissions in this case to believing she had violated the order are largely irrelevant. The question is whether the concept of physical placement included within the family court order did, as a matter of law, prohibit the underlying conduct in which she engaged at the school.

major decisions made by a person having legal custody." We interpret statutes and review their application to undisputed facts de novo. *Lubinski v. Lubinski*, 2008 WI App 151, ¶5, 314 Wis. 2d 395, 761 N.W.2d 676.

¶16     We have previously stated that "physical placement encompasses the act of having a child physically present with the parent" and it "grants that parent rights consistent with legal custody." *Id.*, ¶8. Rights consistent with legal custody means that the parent exercising physical placement has the right and responsibility to make routine daily decisions regarding the child's care that are not inconsistent with the major decisions made by a person having legal custody. *See Opichka*, 323 Wis. 2d 510, ¶13. Hansen asserts that this statutory language contemplates and covers only situations when she is exerting her authority to "parent" her children, which is separate and distinct from her ability to merely "visit"[4] them—i.e., giving them a hug, greeting them, and sitting down with them while they are eating lunch at school. In other words, Hansen contends that she must have actually made decisions about her children's daily care to have exercised physical placement. Under this view of the law, Hansen contends her conduct could not have violated the family court order regarding physical placement.

¶17     In advancing these contentions, Hansen maintains that the circuit court erred in relying on *Opichka* to conclude that, with respect to parents, visitation and physical placement are one and the same, such that any parental

---

[4] The Wisconsin Statutes do not define "visitation," but based on dictionary definitions, this court has defined that term to mean "to go or come to see[,] or to stay with as a guest." *Rick v. Opichka*, 2010 WI App 23, ¶12, 323 Wis. 2d 510, 780 N.W.2d 159 (quoting *Lubinski v. Lubinski*, 2008 WI App 151, ¶9, 314 Wis. 2d 395, 761 N.W.2d 676).

contact with a child constitutes physical placement. She contends that *Opichka* does not hold that "visitation" is the same thing as "physical placement." Rather, she argues, "[t]he two legal terms have distinct meanings; saying 'hi' and giving hugs is not exercising 'physical placement.'" Finally, relying on *Lubinski*, 314 Wis. 2d 395, ¶¶8-9, Hansen argues that "placement" also grants the noncustodial parent "rights consistent with legal custody," which rights do not extend to non-parents who exercise court-ordered visitation.

¶18 We begin by noting that we agree with a number of the legal principles on which Hansen relies. First, we fully agree with Hansen that, in Wisconsin, "visitation" is not a term that applies to parents, but only to other relatives—i.e., grandparents, great-grandparents, stepparents, and others who have "maintained a relationship similar to a parent-child relationship with the child." WIS. STAT. § 767.43. We also agree with Hansen—and with our earlier assessment in *Opichka*—that the concepts of placement and visitation are not exactly the same, either in the legal or the colloquial sense. *See Opichka*, 323 Wis. 2d 510, ¶14. Finally, although Hansen's citation to *Lubinski* is accurate, *Opichka* later made clear that both grandparents with "visitation" rights and noncustodial parents with rights to "physical placement" have the same ability to make decisions regarding a child, insomuch as both are allowed "to make routine daily decisions regarding the child's care, but may not make any decisions inconsistent with the major decisions made by a person having legal custody." *See Opichka*, 323 Wis. 2d 510, ¶13.

¶19 Unlike Hansen, we do not discern how any of the foregoing principles or differences in terminology change the fact that placement, like approved visits by non-parents, "encompasses the act of having a child physically present with the parent." *Id.*, ¶8. This is a statutory right attendant to physical

placement that is separate from, and independent of, the additional right "to make … routine daily decisions regarding the child's care, consistent with the major decisions made by a person having legal custody." *See* WIS. STAT. § 767.001(5). Hansen, however, could not have the right to be physically present with the children without her also having the right to make routine daily decisions regarding their care. Here, she had neither right.

¶20 Hansen's assertion that she did not exercise physical placement because there was no evidence that she made routine daily decisions regarding her children's care during their lunch is therefore misplaced. Under the court order at issue, the determination of whether Hansen violated the physical placement order did not turn on whether (or how) such care decisions actually occurred during a face-to-face interaction. Nor should a fact finder have to wade into such nebulous questions.[5] Hansen did not have the right to be present with the children—i.e., to visit them—at their school without preapproved supervision. Under those circumstances, she was not entitled to (nor did she have the responsibility) to make routine decisions regarding their care. Whether Hansen did so or not is irrelevant. Rather, a parent exercises rights attendant to physical placement if he or she is

[5] Indeed, peril and confusion would seemingly arise from establishing a rule that a parent can only violate a physical placement order based on what actually happened during the parent's visit with his or her children, as Hanson suggests in her reply brief. For example, what if Hansen instructed her children on what to eat or not eat at lunch? Would she then be making "routine daily decisions regarding the child's care," and thus exercising "physical placement"? Hansen suggests in her reply brief that the answer is perhaps so, but those are not the facts here.

But surely the violation of, or compliance with, a physical placement order should not turn on such minor variables. To put a finer point on this notion, are not the hugs from Hansen— a parent—to her children that occurred here themselves acts regarding a child's care? Under Hansen's view, we question who decides this answer, under what legal standards, and when. This infirmity with Hansen's position further supports the sensibility of our holding that physical placement encompasses a parent's mere visits with her child, regardless of whether the parent actually made routine decisions regarding the child's care during those visits.

physically present with his or her children and in a position to make decisions regarding their daily care.[6]

¶21    Accordingly, at trial, the concern properly was not whether Hansen exercised the additional rights associated with legal custody that a parent has while exercising physical placement.[7]  *See Lubinski*, 314 Wis. 2d 395, ¶9.  Rather, the concern was whether Hansen had the right to be physically present with her children at a time and under circumstances that her presence was prohibited by the family court order.  In this regard, whether one labels an interaction between a parent and his or her child "placement" or "visitation," it is only during these interactions that a parent—just like a non-parent exercising visitation rights—is able to be physically present with his or her children.

¶22    For the foregoing reasons, we conclude that the Wisconsin Statutes and case law do not provide for a parent's "visitation" with his or her children as being distinct from the first and basic aspect of a parent's physical placement with them.  A parent must be present and interact with a child to exercise physical placement.  Here, Hansen's personal interaction with her children—i.e., her

_____

[6] To elaborate on the scope of our holding here, statutory "physical placement" does not occur when a parent has *any* physical proximity to his or her child.  For example, if a parent attends a sporting event in which his or her child participates, the parent might be physically present with the child, at least in some sense, but not in a manner where he or she could make, or is responsible to make, decisions regarding the child's daily care.  Furthermore, because Hansen does not argue that her violation of the order was reasonable under the circumstances, such as for her to tend to an emergency, we do not have occasion here to decide whether an intentional, yet reasonable, violation would constitute a valid defense to a criminal contempt of court charge.

[7] As alluded to in our footnote 5 above, we tend to believe that a parent's interaction with his or her children inherently involves his or her making decisions regarding a child's care.  Regardless, our conclusion here need not, and does not, depend on the validity of such a notion.  As noted in our opinion, Hansen violated the family court order merely by invoking her separate, underlying right to be physically present with her children in a position where she was readily able to exercise decisions regarding their daily care.

visit—was prohibited by the family court order. Therefore, whether Hansen's rights under the family court order were described during witness examinations, the parties' arguments, and in the jury instructions as "placement" or "visitation," such characterizations had no discernable impact on what authority she had to be physically present and interact with her children. Use of either term allowed the jury to properly assess whether Hansen in fact violated the family court order.

¶23 Based on the undisputed evidence, a jury could plainly find that Hansen violated the family court order. She was permitted to have in-person interaction with her children only once a week, and then only when arranged and supervised, neither of which occurred with respect to her visit at the school. On this record, Hansen's contempt of court conviction is valid and in accordance with Wisconsin law.

¶24 We address one final matter before concluding our discussion of this issue. Namely, we reject Hansen's assertion that our application of *Opichka* in reaching our holding today will lead to absurd results, such as where a parent would be subject to contempt of court by merely being in the same room as his or her children. One element of contempt under WIS. STAT. ch. 785, upon which the jury was properly instructed in this case, is that the violation be intentional. *See* WIS. STAT. § 785.01(1); WIS JI—CRIMINAL 2031 (2009); *see also* WIS. STAT. § 767.471(5)(b) and (5)(b)2.b. (requiring a court to find that a parent "has intentionally and unreasonably" violated rules of physical placement before it can find that parent in contempt of court under ch. 785). Hansen does not, and cannot, assert that her interaction with her children at the school was anything but intentional, as opposed to a matter of happenstance. Hansen sought out her children, and in the process of doing so, she deceived school staff regarding her

identity. To be clear, our decision today is limited to instances in which a parent intentionally violates a court order regarding physical placement.

## II. *Ineffective Assistance of Counsel Claims*

¶25 Hansen also appeals the denial of her postconviction claims that her trial counsel was constitutionally ineffective.[8] Hansen asserts that these claims, collectively, require that all three of her convictions be vacated, and that a new trial occur on the second-degree recklessly endangering safety and obstructing an officer charges.

¶26 Appellate review of an ineffective assistance claim presents a mixed question of fact and law. *State v. McDowell*, 2004 WI 70, ¶31, 272 Wis. 2d 488, 681 N.W.2d 500. We will not disturb the circuit court's findings of fact unless they are clearly erroneous, but determining whether counsel's performance fell below the constitutional minimum presents a question of law that we review independently. *Id.*

¶27 To substantiate a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's errors were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one. *Id.* at 697.

---

[8] The State argued in its response brief that we lack jurisdiction over Hansen's ineffective assistance of counsel claims because Hansen did not file a notice of appeal from the circuit court's order denying her postconviction motion. On December 4, 2019, Hansen addressed the State's arguments by filing an amended notice of appeal and a motion to extend the time to file an amended notice. We granted Hansen's motion; therefore, we have jurisdiction over Hansen's ineffective assistance of counsel claims, and we will address the merits of her claims.

¶28   To establish deficient performance, a defendant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. *Id.* at 687. A defendant proves prejudice by demonstrating there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. *Id.* at 693. However, a defendant need not prove the outcome would more likely than not be different in order to establish prejudice in ineffective assistance cases. *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citing *Strickland*, 466 U.S. at 693).

¶29   Hansen first alleges that her trial counsel performed deficiently by not investigating whether the family court order actually proscribed her conduct in the school, and by not raising that issue. This argument is largely, if not entirely, derivative of Hansen's argument challenging the legal validity of her judgment of conviction for contempt in the first instance. For the reasons explained above, we reject, on the merits, the notion that the family court order did not proscribe Hansen's conduct of visiting her children at their school without approval or supervision. It is well established that trial counsel could not have been ineffective for failing to make meritless arguments. *State v. Allen*, 2017 WI 7, ¶46, 373 Wis. 2d 98, 890 N.W.2d 245. Accordingly, Hansen has demonstrated neither deficiency nor prejudice on this claim.[9]

---

[9] Hansen contends that while her counsel's alleged ineffectiveness on these grounds "most directly affected the contempt-of-court charge, … it also damaged Ms. Hansen's

(continued)

¶30    Hansen also claims her counsel was ineffective by not using the body camera video of a law enforcement interview of her to impeach the interrogating officer's rebuttal testimony regarding her "nudging" the liaison officer with her vehicle when she attempted to leave the school parking lot. She contends such impeachment would have improved her credibility.

¶31    Some further background is necessary for purposes of this claim. As noted above, the liaison officer testified that Hansen's vehicle made glancing contact with his right side during her exit from the parking lot. After Hansen's arrest, Sergeant Matthew Krzoska of the Outagamie County Sheriff's Office interviewed Hansen. During that interview, Hansen admitted to having "nudged forward" her vehicle toward the school liaison officer in order to get him out of her way. She adamantly denied, however, striking or otherwise making contact with him during those movements.

¶32    During Hansen's cross-examination at trial, the State asked a series of leading questions to the effect that she had, in fact, previously told Sergeant Krzoska that she had "nudged" the liaison officer with her vehicle. In her cross-examination answers, Hansen consistently denied having made such statements to Krzoska and denied making physical contact with the officer while moving her vehicle. She admitted only to moving her vehicle by "inch[ing] forward when I knew there was distance between us" to encourage him to stop blocking her ability to leave.

---

credibility, which was at issue for the other two counts. As the prosecutor stated in closing arguments, 'There is a court order. Does she listen? No.'" Given our rejection of Hansen's arguments regarding the legal scope of the family court order, there can be no error, much less an unfairly prejudicial one, from the prosecutor's aforementioned comments in closing argument.

16

¶33    After the defense rested its case, the State called Sergeant Krzoska in rebuttal.  He had previously testified in the State's case-in-chief that he had spoken with Hansen on the date of the incident.   During his rebuttal testimony, the following exchange occurred between the State and Krzoska:

> Q: [W]hen you were discussing the circumstances surrounding Ms. Hansen's operation of the motor vehicle and her contact with [the liaison officer], what if any particular terms did she use that you recall regarding that contact?
>
> A: Specifically she used the term "nudge".
>
> Q: Did you try to clarify that with her?
>
> A: It was taken as she was trying [to] nudge him out of the way or move him from the front of the vehicle.

Hansen's counsel did not cross-examine Krzoska after his rebuttal testimony.

¶34    Hansen's trial counsel acknowledged at the *Machner* hearing that she could have impeached Sergeant Krzoska by using video of Hansen's interview.  Counsel testified, however, that she chose not to use the video in that way because Hansen had, in fact, used the word "nudge" during the recorded interview when describing her movements towards Krzoska, and playing the video would have thus made Hansen appear untruthful because she had denied using that term.

¶35    We conclude Hansen's counsel did not perform outside of the range of a competent attorney by opting not to play the video in surrebuttal.  As an initial matter, Hansen overstates the probative value of the omitted video's statements.  We perceive no clear contradiction among the relevant testimony and statements regarding the incident.  A person can be construed as having used a vehicle to "nudge" another individual away from the vehicle's path with or without making

contact with that other person. Sergeant Krzoska's rebuttal testimony was thus not inherently contrary to the relevant portions of the interview video, including Hansen's statements therein. He never expressly said that Hansen actually hit the liaison officer while moving her vehicle forward; meanwhile, it was clear that Hansen consistently denied doing so. Moreover, Krzoska's testimony regarding Hansen's "contact with" the liaison officer is itself vague as to whether he was referring to Hansen's physical contact with the officer or simply their interaction with each other generally. Even Hansen, in her postconviction motion, acknowledged that "Hansen's idiosyncratic use of the word 'nudge' to mean 'move forward slightly' could be a source of confusion."

¶36 In all events, the jury was well aware of the dispute between Hansen and the liaison officer over whether she initiated physical contact between him and her vehicle. Given the vagueness of the various witnesses' references to Hansen's "nudging," the efficacy of attempting to impeach Sergeant Krzoska's rebuttal testimony was dubious. Furthermore, playing the video would not diminish the extensive, largely uncontested evidence that Hansen endangered the liaison officer's safety by driving her vehicle toward him in such a way that, at the very least, it came within inches of his right foot and leg, causing him to jump to the side to avoid being hit, all while Hansen repeatedly ignored his orders to stop. All of the foregoing militates against concluding that Hansen was prejudiced by her counsel's failure to play the video after Krzoska's rebuttal testimony.

¶37 In addition, whatever impeachment value the video may have had, Hansen's counsel articulated reasonable concerns with using the video. As the circuit court found, the video would have supported the liaison officer's testimony both because Hansen made numerous confusing, contradictory and incriminating statements, and because she also admitted that she was "nudging" the officer with

18

her vehicle, regardless of her possibly not striking him with it. Counsel was reasonably concerned that such admissions would be problematic to the defense in terms of Hansen's overall credibility. Furthermore, the court also found that the video was generally cumulative to Hansen's own trial testimony, such that playing it had even less utility. *See* ***State v. Tkacz***, 2002 WI App 281, ¶25 n.5, 258 Wis. 2d 611, 654 N.W.2d 37.

¶38 Hansen responds by noting that all of the supposedly damaging materials—including her untruths to the school officials, and her belief that she was in violation of the family court order—had already been presented to the jury through other means. Still, it was reasonable for Hansen's counsel to conclude that repeating such information—and especially doing so by using Hansen's own words presented via videotape—would be harmful to the defense, particularly given the relatively marginal impeachment value of the video. In short, Hansen has failed to establish either deficiency or prejudice with respect to her ineffective assistance of counsel claim regarding her counsel not playing the interrogation video following Sergeant Krzoska's rebuttal testimony.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.