**2023 WI App 33**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2021AP1705-CR

† Petition for Review filed

Complete Title of Case:


**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**CEDRIC TUNG,**

**DEFENDANT-APPELLANT.**


| | |
|---|---|
| Opinion Filed: | July 26, 2023 |
| Submitted on Briefs: | June 22, 2022 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Brash, C.J., Donald, P.J., and White, J. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:        On behalf of the defendant-appellant, the cause was submitted on the brief of *Jeffrey W. Jensen*.

Respondent
ATTORNEYS:        On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jacob Wittwer*. Assistant attorney general.

2023 WI App 33

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## June 20, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* **WIS. STAT. § 808.10 and RULE 809.62.**

Appeal No. **2021AP1705-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2017CF2817**

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

CEDRIC TUNG,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: MARK A. SANDERS and SANDY A. WILLIAMS, Judges. *Affirmed*.

Before Brash, C.J., Donald, P.J., and White, J.

¶1 WHITE, J. Cedric Tung appeals from his judgment of conviction, entered upon a jury's verdict, for first-degree child sexual assault, as well as the order denying his motion for postconviction relief. Tung argues that his trial

counsel abandoned her role as a zealous advocate in his defense, which violated his Sixth Amendment right to effective counsel, and constitutes structural error requiring a new trial. We conclude that Tung has failed to show that trial counsel conceded guilt against his express will or that there was a breakdown in the adversarial process. Therefore, we conclude there was no violation of his Sixth Amendment rights, we find no structural error, and we affirm.

## BACKGROUND

¶2      Tung was charged with first-degree child sexual assault–sexual contact with a child under age thirteen arising out of an incident in June 2017 when Tung allegedly touched a seven-year-old girl. Tung, then age nineteen, had been living off and on for about two years with Charles and his two daughters, Samantha, then age seven, and Allison, then age eleven.[1] The criminal complaint alleged that Tung had called Samantha over to the couch to cuddle with him. While they were lying down, Tung pulled up Samantha's dress and put his hand under her tights but over her underwear and rubbed her vaginal area for approximately ten to fifteen seconds.

¶3      The following day, on June 11, 2017, Milwaukee Police Department (MPD) officers responded to Charles's call reporting that Tung had sexually

---

[1] To protect the privacy of Samantha and her family, we refer to her and her family by pseudonyms. *See* WIS. STAT. RULE 809.86 (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

assaulted Samantha. An MPD detective conducted a Mirandized[2] interview with Tung, in which he admitted that he touched Samantha.

¶4 The case proceeded to a jury trial in February 2018.[3] In trial counsel's opening argument, she stated that although Tung "minimized everything that was going on" in his police interrogation, the defense was "not going to tell you that it didn't happen[.]" "We're having a trial because [Tung] never meant to have any type of sexual contact with this child. It was a pure accident. He's sleeping, he's tired. We don't really know exactly what happened."

¶5 During the State's case, it called the MPD officer who conducted a forensics interview with Samantha on June 12, 2017. The officer testified that Samantha told her about Tung touching her by using dolls to show their positioning. The State called Samantha, who testified, also aided by dolls, that Tung touched her "front butt" and that made her feel "weird." The State called Charles, who testified that he met Tung through church and allowed Tung to stay over at his apartment "pretty consistently" over about two years. He testified that on Sunday, June 11, 2017, Samantha told him that Tung had touched her "down there" the day before.

¶6 Charles testified that he texted Tung about Samantha's claim, asking Tung if he touched her and threatening that he would call the police if Tung did not answer. Tung did not answer, so he called 911 to report the matter. Tung replied via text to Charles later that day, with his first message stating:

> [Charles], I've done lots of things in my life that I'm not
> proud of. Some you know, others you don't and I will have
> to live with that for the rest of my life and if you want to talk

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] The Honorable Mark A. Sanders presided over Tung's trial and sentencing. We refer to Judge Sanders as the trial court.

fully about that, I'm willing to do so but what I am not is a monster and I would have thought you'd know that.

I've lived with you long enough. I'm sorry for not telling you what had happened yesterday. Just I was embarrassed and didn't know how to bring it up like without sounding bad though now I wish I had.

Charles asked Tung where Samantha would have gotten that idea or why she said that. Tung replied: "Kids these days are more grown than you realize simply due to their environment and maybe when I pushed her the first time, she had gotten the wrong idea." He continued that, "It wasn't until the second time I actually explained to her the situation." Charles asked if Tung's hand went near Samantha's "upper thigh" or "groin." Tung replied that he had fallen asleep and "I woke up sometime later because I felt someone next to me and I hate sleeping next to someone." Tung stated that Samantha was "cuddling next to" him while he was not "fully awake." He texted, "I pushed her. She tried to again. I pushed her a little harder. I think she bumped her head on the lamp post." Tung continued that he fell asleep and when Samantha tried to cuddle him again, he woke up "right away" and "explained to her that although it's okay to cuddle with family I'm not her family, not really, and don't do it again."

¶7      The State called MPD Detective Steven Wells, who conducted the in-custody interview of Tung on June 12, 2017; the recorded interview was played for the jury at that point. The detective asked Tung if he touched Samantha's vagina, and after a very long pause, Tung said yes.

¶8      Tung testified in his own defense, stating that he was sleeping on a sofa chair in the living room of Charles's apartment and he knew the girls were home. He testified that he felt Samantha lie next to him while he was sleeping and he pushed her away from him. He testified that he did not intend to touch Samantha

5

in a sexual way, nor did he ever intend to get sexually aroused. He stated that in the police interview, the detective did not seem to believe his explanation and that the detective stated that the family wanted a "simple admission." Tung testified, "How hard is it to swallow my pride and admit to something even if I didn't do it but which would help me now and not let me get into more troubles in the future." He believed that if he admitted to the police he was guilty, even though he was not, things would be "smoothed over" with Charles and his family.

¶9 During cross-examination, Tung had the following exchange with the prosecutor:

> Q And somehow you were a close integral part of [Samantha's] life and she suddenly out of blue said that you touched her, right?
>
> A Correct.
>
> Q You did touch her, right?
>
> A Not correct.
>
> Q No? So you talked to Detective Wells and you said you touched her over her underwear, that was not correct?
>
> A It's correct that I said that.
>
> Q So, but you didn't do it?
>
> A But I didn't do it.
>
> Q So you lied to Detective Wells?
>
> A Yes, I did.

¶10 Later in the cross-examination, Tung testified, "Anybody who is arrested for sexual assault, yes, they are looking out for themselves." He stated that the detective implied he could leave if he admitted that he touched Samantha, and the detective also asked if Tung was doing anything to help himself. When asked

if he was "coming up again with other stories to help yourself now?" Tung replied, "Correct. That's what I'm doing right now."

¶11    In closing arguments, trial counsel asked the jury to look at the evidence. She argued:

> [Tung] is having this trial because he never intended to touch her in a sexual way, and I think that's clear when you look at everything okay?
>
> ….
>
> [D]id this guy have the intent to touch this child in any sexual way? No. Did he touch her accidentally because he's like in the middle of sleeping or whatever? Yeah. I think that she was cuddling. I think maybe he grabbed her, maybe he pulled her, but just like the [S]tate is saying, well, tights, you know, he dug in.
>
> ….
>
> [H]e took the stand … he wanted to let you guys know, man, I never did this, and then she says … he was doing this ….
> Does it make sense?
>
> ….
>
> I think they were cuddling, but [Tung] never, ever, ever intended to touch her or to get aroused by touching her.

¶12    The jury returned a guilty verdict and the court entered the judgment against Tung. At the sentencing hearing, Tung's statement to the court was that he was "innocent of the charges[.]" The trial court imposed a sentence of fifteen years divided as seven years of initial confinement and eight years of extended supervision.

¶13    In April 2020, Tung moved for postconviction relief pursuant to WIS. STAT. RULE 809.30, asserting that trial counsel was ineffective for pursuing a theory of defense that Tung prohibited her from using. In September 2021, the

postconviction court held an evidentiary hearing on Tung's claims.[4]  Tung and his trial counsel both testified.

¶14     Tung testified that he met with trial counsel at least twice prior to trial. Tung recounted that they discussed the best defense strategy, and stated that trial counsel told Tung that she wanted to argue that he had no intent.  Tung told trial counsel, "I understand where she's coming from; but when I go and take the stand, I'm not gonna say that yes, I touched the child, but there was no intent."  Tung stated that he thought trial counsel understood his position, but during her opening statement at trial, she told the jury that he touched the girl in the genital area, but it was accidental and he had no intent to get sexual gratification.  He stated that he made himself clear to trial counsel that he did not want to admit to the jury that he touched the child in her genital area.

¶15     Trial counsel testified that she, then a State Public Defender (SPD) attorney, along with an SPD investigator, met with Tung several times before trial. She did not recall discussing a trial strategy as much as discussing the facts— including the police reports and text messages between Charles and Tung.  She recalled that Tung stated he wanted to maintain his innocence.  Tung had been sleeping and it was a matter of the State proving intent.  She did not consider that she was conceding guilt by arguing one element of the charge could not be proven. She was aware that in Tung's police custodial interview, he admitted he touched Samantha's vagina.  She stated that in a pretrial meeting, Tung admitted to trial

---

[4] The Honorable Sandy A. Williams presided over Tung's postconviction proceedings. Because Tung's trial counsel had been appointed a judge in Milwaukee County Circuit Court, a judge from Ozaukee County conducted the proceedings.  We refer to Judge Williams as the postconviction court.

counsel that he inadvertently touched Samantha's vagina that day. She did not recall Tung telling her not to admit to the jury that he touched the girl in the vaginal area.

¶16 Trial counsel was asked why she conceded that Tung touched Samantha. She stated, "Because he had admitted to me that he had done it. He also had admitted to the father that he had had some touching to the child, and a—it would have been unprofessional for me to make a statement that was inconsistent with the evidence." Upon questioning by postconviction counsel, trial counsel confirmed that her conversations with Tung in which he admitted to touching Samantha were not in evidence during the trial. The State asked trial counsel if ethically she could support a defense saying Tung did not touch Samantha, to which trial counsel replied, "no" and it would be "difficult."

¶17 The postconviction court denied Tung's motion. The court found that in a judgment call over credibility between Tung and trial counsel, trial counsel was "more credible, in terms of being able to recall in detail what those meetings were about, and there was never any objection expressed about the defense." The court stated that trial counsel "did not concede guilt in any way" and offered an explanation for the overwhelming evidence presented by the State—that there was no intent and therefore, no guilt. The postconviction court stated that "the closing argument was consistent with everything else, in terms of being able to explain all the other evidence that had been presented." It concluded that the defense failed to meet its burden.

¶18 Tung appeals.

**DISCUSSION**

¶19     Tung argues that structural error by trial counsel entitles him to a new trial.  He argues that his constitutional right to maintain innocence as the objective of his defense was violated, pursuant to *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018).  Additionally, he argues that his Sixth Amendment right to counsel was violated when the adversarial process broke down, pursuant to *United States v. Cronic*, 466 U.S. 648 (1984).  "This court independently reviews whether deprivation of a constitutional right has occurred." *State v. Chambers*, 2021 WI 13, ¶13, 395 Wis. 2d 770, 955 N.W.2d 144.  To understand why we reject each of his arguments, we begin with the law.[5]

I.     *McCoy: defense objective and effective assistance*

¶20     In *McCoy*, the United States Supreme Court held that a defendant has "[a]utonomy to decide that the objective of the defense is to assert innocence[.]" *Id.*, 138 S. Ct. at 1508.  McCoy's attorney assessed the capital murder case against McCoy, who was accused of killing several members of McCoy's estranged wife's family, and concluded that a concession of guilt was McCoy's best chance of avoiding the death penalty.  *Id.* at 1505-06.  McCoy's attorney "told the jury there was 'no way reasonably possible' that they could hear the prosecution's evidence

---

[5] Tung rightfully does not argue ineffective assistance of counsel.  The Supreme Court explained that "[b]ecause a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence," under either *Strickland v. Washington*, 466 U.S. 668 (1984), or *United States v. Cronic*, 466 U.S. 648 (1984). *McCoy v. Louisiana*, 138 S. Ct. 1500, 1510-11 (2018).  "To gain redress for attorney error, a defendant ordinarily must show prejudice"; however, "[v]iolation of a defendant's Sixth Amendment-secured autonomy ranks as" structural error and is "not subject to harmless-error review." *Id.* at 1511.  However, a *Cronic* claim may also trigger structural error.  "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable" and "'no amount of showing of want of prejudice would cure it.'" *Id.*, 466 U.S. at 659 (citation omitted).

10

and reach 'any other conclusion than Robert McCoy was the cause of these individuals' death.'" *Id.* at 1506. McCoy protested to the court, out of earshot of the jury, that his attorney was "'selling [him] out' by maintaining that McCoy 'murdered [his] family.'" *Id.* "McCoy testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom." *Id.* at 1507. Nevertheless, in closing arguments on the guilt phase of the trial, McCoy's attorney "reiterated that McCoy was the killer." *Id.* In the penalty phase of the trial, McCoy's attorney "urged mercy in view of McCoy's 'serious mental and emotional issues[.]'" *Id.*

¶21 The United States Supreme Court concluded in *McCoy* that the Sixth Amendment right to the effective assistance of counsel provides for just that—assistance—and still grants a defendant a personal right to determine the defense. *Id.* at 1508. "Counsel, in any case, must still develop a trial strategy and discuss it" with the defendant. *Id.* at 1509. "If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." *Id.* Nevertheless, when faced "with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way." *Id.*

¶22 The Wisconsin Supreme Court explained that "to succeed on a *McCoy* claim, the defendant must show that he or she 'expressly assert[ed] that the objective of "his defence" is to maintain innocence of the charged criminal acts' and the lawyer did not 'abide by that objective and [overrode] it by conceding guilt.'" *Chambers*, 395 Wis. 2d 770, ¶20 (citations omitted, brackets in original). We reject Tung's *McCoy* claim for two reasons: first, that trial counsel did not concede Tung's ultimate guilt; and second, that Tung failed to show that trial counsel had express instructions to pursue an innocence defense and then failed to abide by that objective.

11

¶23     First, our examination of the record supports that trial counsel did not concede Tung's guilt during the trial.  While Tung claims trial counsel "asserted that Tung had lied in his testimony," the record does not reflect that to be a fair characterization of her closing argument.  Trial counsel stated that Tung did not "have the intent to touch this child in any sexual way" and that he "touch[ed] her accidentally because he's … sleeping."  Trial counsel acknowledged that Tung said, "I never did this," and managed to put it into the context of the defense's position that there was no intent:  it did "not make sense," there was "cuddling," but Tung "never … intended" to touch Samantha or "to get aroused by touching her."  The postconviction court made a finding that there was no concession.  The State also states that Tung's description of the closing argument is misleading.

¶24     Second, Tung failed to show that he instructed trial counsel to pursue an innocence defense objective.  In the postconviction hearing, Tung asserted that he professed a defense objective to claim innocence.  In contrast, trial counsel testified that Tung had explained to her that the touching was accidental and inadvertent.  Further, trial counsel had evidence of two other instances of Tung admitting he touched Samantha—to Detective Wells in the police interview and to Charles in a text.  Therefore, trial counsel testified that she formed a trial strategy based upon the "intent" element of the sexual assault charge.  Moreover, trial counsel testified that she did not recall Tung saying anything to her about her opening statement, or Tung expressly telling her that she should not concede that he touched the girl in her vaginal area.[6]  The postconviction court found trial counsel

---

[6] The record does not reflect that Tung protested to counsel during the trial about the strategy or that Tung attempted to protest to the court about the difference in objective.

credible in her testimony.[7]  Therefore, Tung's *McCoy* claim fails on the first prong of the test provided in *Chambers*.  He fails to show that he made express statements to trial counsel that his defense was absolute innocence to all parts of the charge. Accordingly, he also fails to show that trial counsel disobeyed his instruction. Therefore, we conclude that Tung has failed to show structural error through trial counsel impeding Tung's right to control the defense objective under *McCoy* or a violation of his Sixth Amendment rights.

### II.    *Cronic*:  breakdown in the adversarial process

¶25    While Tung concedes that his claim does not fall neatly under the *McCoy* framework, he asserts that trial counsel abandoned zealous advocacy, which also implicates his right to effective counsel by breaking down the adversarial process, pursuant to *Cronic*.  *See id.*, 466 U.S. at 656-57.[8]  In *Cronic*, the United States Supreme Court examined the fundamental role of the effective assistance by counsel for a criminal defendant to receive a fair trial.  *Id.* at 656.  The Sixth Amendment requires that counsel act as an advocate for the defendant within an adversarial process—maintaining "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing."  *Id.* "[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."  *Id.* at 656-57.

---

[7] The State argues that Tung has not challenged the postconviction court's findings and credibility determinations; therefore, without an argument the findings are clearly erroneous, Tung does not dispute trial counsel's testimony that prior to trial, Tung told trial counsel that he had touched Samantha.

[8] The State argues that Tung forfeited an argument based on *Cronic*, asserting that he failed to make the argument to the postconviction court and raises it for the first time on appeal. Although the record reflects that *Cronic* was not discussed during the postconviction evidentiary hearing, Tung referenced *Cronic* in his written postconviction motion.  We are not persuaded that Tung raises a new argument on appeal.

13

¶26    Tung admits that trial counsel did not expressly concede guilt in her closing argument; however, he asserts that she made the guilty verdict a "foregone conclusion" by telling the jury that Tung had lied in his trial testimony when he said that he never touched Samantha's vagina. As we noted above, we reject Tung's characterization of trial counsel's closing argument. Trial counsel did not claim that Tung testified untruthfully or lied.

¶27    Next, Tung contends that when defense counsel "contravenes her loyalty to the client, a criminal proceeding loses its character as a confrontation between adversaries." To succeed under this theory, Tung would need to show that counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing[.]" *Cronic*, 466 U.S. at 659. The record does not support this argument. To find Tung guilty, the court instructed the jury that it had to find that Tung had "sexual contact" with Samantha, the touching was "intentional," and Tung "acted with the intent to become sexually aroused or gratified." Trial counsel vigorously contested the State's case and maintained that the State could not prove beyond a reasonable doubt that "intentional touching … for the purpose of … sexually arousing or gratifying the defendant" had occurred. *See* WIS. STAT. § 948.01(5) (defining sexual contact). We conclude that the prosecution's case was subject to adversarial testing.

¶28    Tung asserts that trial counsel should have modified her closing argument to mirror Tung's testimony during cross-examination. The record reflects in his testimony, Tung denied touching Samantha at all. However, our examination of the record also shows that Tung claimed that he lied to Detective Wells when he told the detective he touched the child. Tung also agreed that he was "coming up again with other stories to help [himself] now."

14

¶29 During the postconviction hearing, trial counsel raised ethical concerns about Tung's testimony and her ability to advocate for his acquittal despite his inconsistent testimony, as shown in this exchange between postconviction counsel and trial counsel:

> Q And even though you suspect that—personally suspect it might not be true, you still have an obligation to zealously advocate that testimony to the jury, right?
>
> A Yes and no. I have to zealously represent them, and I have to zealously advocate for them. But if they might—If they're not truthful when they're testifying, I don't know if I have to align with that testimony.

¶30 Tung argues that trial counsel did not have proof in evidence that Tung was planning to perjure himself.[9] With a client's "unambiguous" "admission of intent to testify untruthfully," defense counsel may then "substitute narrative questioning for the traditional question and answer format[.]" *State v. McDowell*, 2004 WI 70, ¶43, 272 Wis. 2d 488, 681 N.W.2d 500. However, that is not the situation here—trial counsel was not aware of a plan to be untruthful and did not act to change her mode of examination. Tung's substantially inconsistent testimony arrived during cross-examination. At that point, trial counsel knew that the jury had heard Detective Wells testify that Tung admitted he touched Samantha and had heard Charles testify about Tung's text messages that did not deny the touching.

---

[9] On appeal, Tung elaborates on the argument made in the postconviction stage that if trial counsel had knowledge that Tung would testify untruthfully, it would have triggered a change to narrative testimony instead of question and answer, pursuant to *State v. McDowell*, 2004 WI 70, ¶43, 272 Wis. 2d 488, 681 N.W.2d 500. While the State argues that this argument is being raised for the first time on appeal, we see the extension of the line of questioning regarding defense attorney ethics in the evidentiary hearing. Postconviction counsel asked trial counsel, "Ethically speaking, the only time a defense lawyer is prohibited from allowing his or her client from testifying is when the client says, I'm gonna go up there and commit perjury, correct?" Trial counsel answered "Correct." Although *MacDowell* was not referenced by name in the evidentiary hearing, the law and argument at issue are substantially the same. While we are not persuaded by Tung's argument regarding *MacDowell*, we conclude it is not forfeited as a new argument on appeal.

Further, trial counsel had her personal knowledge that Tung told her he accidentally touched Samantha.

¶31   Trial counsel was bound by the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys, which among its strictures includes candor to the tribunal, under SCR 20:3.3 and that an attorney may not "assist a witness to testify falsely," under SCR 20:3.4. "Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law." *Nix v. Whiteside*, 475 U.S. 157, 166 (1986). In this situation, trial counsel had to decide how to proceed after Tung made statements during cross-examination that were inconsistent with the record and her personal knowledge of Tung's description of his conduct. We cannot fault her decision to continue her trial strategy and focus on whether the State could prove the intent element of the charge. Trial counsel advocated for Tung and submitted the prosecution's case to adversarial testing. *See Cronic*, 466 U.S. at 656. We conclude that trial counsel did not abandon her zealous advocacy of her client. Accordingly, we find no violation of Tung's Sixth Amendment rights pursuant to *Cronic*.

## CONCLUSION

¶32   We conclude that Tung has failed to show structural error in his conviction through a violation of his Sixth Amendment right to effective counsel. He has failed to show that trial counsel abandoned her zealous advocacy of her client, either by implicating Tung's constitutional right to maintain innocence as the objective of his defense, pursuant to *McCoy*, or by not holding the prosecution case to adversarial testing, pursuant to *Cronic*. Accordingly, we affirm his judgment of conviction and the denial of his motion for postconviction relief.

16

*By the Court.*—Judgment and order affirmed.

Recommended for publication in the official reports.